## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| JOHN DOE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|       v. | ) | Case No. 1:15-cv-209 |
| | ) | |
| THE RECTOR AND VISITORS OF | ) | |
| GEORGE MASON UNIVERSITY, *et al.*, | ) | |
|     Defendants. | ) | |

### MEMORANDUM OPINION

Plaintiff John Doe[1] is a former George Mason University ("GMU") student who was expelled from GMU following an administrative process that found him responsible for various violations of GMU's student conduct regulations, including regulations pertaining to sexual misconduct. In this action, plaintiff challenges his expulsion. Specifically, in a ten-count Second Amended Complaint ("SAC"), plaintiff sues the following entities:

> (i) the Rector and Visitors of George Mason University (hereinafter also "GMU"),[2]
> (ii) Angel Cabrera, President of GMU,
> (iii) Brent Ericson, the Assistant Dean of Students and Director of the Office of Student Conduct at GMU, and
> (iv) Juliet Blank-Godlove, the Assistant Dean of Students at GMU,

alleging that these defendants collectively violated

> (i) his right to procedural and substantive due process under the federal and Virginia constitutions (Counts I, II, and III),
> (ii) his First Amendment rights (Count IV),

---

[1] Defendants' objection to the magistrate judge's Order allowing plaintiff to proceed pseudonymously in this suit was fully briefed, argued, and taken under advisement. *See Doe v. George Mason Univ.*, 1:15-cv-209 (E.D. Va. Apr. 3, 2015) (Order). Because resolution of the objection requires a careful weighing of the interests involved, ruling on this issue has been deferred as it would benefit from a more developed record.

[2] In his brief, plaintiff conceded that GMU is not a suable person under 42 U.S.C. § 1983 and therefore agreed that GMU is not a proper party to Counts I, II, IV, and IX of the SAC.

1

(iii) various common law duties (Counts V, VI, and VII),
(iv) Title IX, codified at 20 U.S.C. § 1681(a) (Count VIII), and
(v) his right to equal protection under the Fourteenth Amendment to the U.S. Constitution
and the Virginia Constitution (Counts IX and X).

Defendants moved to dismiss the SAC pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R.

Civ. P. The motion was fully briefed and argued. A bench ruling and Order issued, (i) dismissing

plaintiff's negligence claims; (ii) denying the motion to dismiss the remaining claims; (iii)

dismissing GMU as a defendant with respect to Counts I, II, IV, and IX; (iv) dismissing Cabrera

as a defendant with respect to Count VIII; and (v) declining to grant Ericson's and Blank-

Godlove's qualified immunity defenses without prejudice, to be raised at the summary judgment

stage. *See Doe v. George Mason Univ.*, 1:15-cv-209 (E.D. Va. June 26, 2015) (Order). This

Memorandum Opinion records, and in some instances alters, those rulings and sets forth the

reasons for them.

## I.

Because defendants' motion includes a subject matter jurisdiction challenge, it is

necessary to address this issue first. In essence, defendants contend that federal question

jurisdiction does not exist because plaintiff has not alleged a property interest protected by the

Constitution sufficient to support plaintiff's due process claims in Counts I and II. This argument

fails.

Failure to allege an element of a claim that is otherwise clearly a federal question claim

constitutes a failure to state a claim pursuant to Rule 12(b)(6), not, as defendants contend, a

failure of subject matter jurisdiction. But even accepting defendants' flawed argument that this

defect would result in an absence of federal question jurisdiction, the SAC alleges other federal

causes of action arising from plaintiff's expulsion from GMU. *See* SAC Counts IV (First

Amendment), VIII (Title IX), and IX (Equal Protection). These claims clearly trigger federal

question jurisdiction. And because plaintiff's state claims in the SAC also arise out of the same transaction or occurrence—his expulsion from GMU—as his federal claims, it is also clear that there is supplemental jurisdiction over the state claims. *See* 28 U.S.C. § 1367. Accordingly, the SAC alleges a sufficient basis for federal jurisdiction over every count of the SAC, and therefore, defendants' motion under Rule 12(b)(1) must be denied.

## II.

The next step in the analysis of defendants' motion is to address defendants' arguments that the claims in the SAC fail to state a claim upon which relief can be granted under Rule 12(b)(6). The facts set forth in the complaint, which are succinctly summarized here, must be assumed to be true for purposes of addressing defendants' Rule 12(b)(6) arguments. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

In 2012, while plaintiff was a student at GMU, he entered into a romantic and sexual relationship with a woman, referred to here pseudonymously as Jane Roe, who did not attend GMU. The sexual component of this relationship involved a practice known as "BDSM," which refers to bondage and discipline, dominance and submission, and sadism and masochism. It is sufficient here to note that some of the sexual activity in this BDSM relationship involved choking, biting, slapping, spanking, whipping, and restraining Roe. As a part of their BDSM practice, plaintiff and Roe agreed on a safe word—"red"—that Roe could use to signal to plaintiff to stop sexual activity. Indeed, Roe specifically told plaintiff that if she ever said "stop" during sex, he should *not* stop because that was part of the BDSM game. The safe word was how Roe would communicate to plaintiff that the activity needed to end.

On the night of October 27, 2013, Roe came to plaintiff's on-campus room to spend the night. Plaintiff alleges that the two then had consensual sex. At one point, Roe used her hand to

3

push against plaintiff, and, at another point, she answered "I don't know" when plaintiff asked if she wanted him to continue sexual activity. At neither point, however, did Roe use "red," the code word for stop.

In January 2014, plaintiff and Roe ended their relationship. In the months following the breakup, plaintiff sent a few text messages to Roe, to which she did not respond. Eventually, in March 2014, plaintiff texted Roe that he would shoot himself if she did not contact him by the following day to let him know she was still alive. Thereafter, on April 15, 2014, Roe reported the events of October 27, 2013, to the campus police at her college and alleged that she had not consented to sexual intercourse that night. Later, on May 2, 2014, she reported the events to the GMU Police, but indicated that she was unsure if she wanted them to pursue her complaint. Pursuant to GMU's policy, the GMU police report was referred to the Dean of Students Office.

On August 19, 2014, plaintiff received an email from defendant Brent Ericson, GMU's Assistant Dean of Students and Director of the Office of Student Conduct. In this email, Ericson advised plaintiff that plaintiff was accused of four violations of GMU's sexual misconduct policy. Specifically, plaintiff was alleged to have violated: (i) Code 2013.7.A (Infliction of physical harm to any person(s) including self); (ii) Code 2013.8.A (Deliberate touching or penetration of another person without consent); (iii) Code 2013.8.C (Conduct of a sexual nature); and (iv) Code 2013.9.B (Communication that may cause injury, distress, or emotional or physical discomfort). SAC ¶ 49.

On September 5, 2014, a hearing on the alleged violations was convened before a panel of three staff and faculty members who had received specialized training in adjudicating sexual misconduct cases. The panel heard testimony from Roe, the GMU police officer who had taken Roe's report, plaintiff, and two other GMU students called by plaintiff. Plaintiff's testimony

described the nature of his and Roe's BDSM relationship, and he specifically stated that certain behaviors that may indicate lack of consent in a non-BDSM sexual encounter did not have the same meaning in a BDSM encounter. On September 12, 2014, the three-member panel issued its decision absolving plaintiff of wrongdoing and finding him "not responsible" on each of the four charges.

Thereafter, on September 19, 2014, Roe filed an appeal on the basis of "procedural irregularities" with the hearing.[3] The deciding official for the appeal was defendant Brent Ericson, the Assistant Dean of Students who had initially notified plaintiff of the accusations against him. Ericson did not allow plaintiff to file anything opposing the appeal, and he evaluated the appeal solely on the basis of the paper and audio record of the panel hearing. Moreover, Ericson had been in contact with a counselor from Roe's school who told Ericson that the police report from Roe's school was "more accurate" than GMU's, which contained "many errors." SAC ¶ 75. Although plaintiff was allowed to meet with Ericson to discuss the appeal, there is no indication that plaintiff was given a formal opportunity to present written or oral arguments in connection with the appeal or to have counsel present.

On October 10, 2014, Ericson issued his decision essentially reversing, in part, the panel's findings and conclusions and instead finding plaintiff responsible for two of the four

---

[3] GMU's procedures provide three grounds for appeal:

(1) Information not available at the hearing which, had it been available, would in all reasonable likelihood have produced a different finding (*i.e.*, responsible versus non responsible);

(2) Substantial procedural irregularity with respect to applicable procedures as determined by the conduct officer; or

(3) Perceived hearing officer bias (or bias by a board member) based on factors other than the hearing officer's decision and rationale for such decision. SAC ¶ 65.

charges: (i) deliberate touching or penetration of another person without consent and (ii) communication that may cause injury, distress, or emotional and physical discomfort. The appeal decision provided no reasoning or explanation, but simply noted that Ericson "decided to modify the original decision of responsibility." SAC ¶ 77. Rather than remanding the matter to the panel for further proceedings or allowing plaintiff an opportunity to present any written or oral arguments addressing the appropriate sanction—an opportunity that would have been provided had plaintiff been found responsible by the initial hearing panel—Ericson summarily proceeded to impose the harshest penalty available – expulsion from GMU.

Plaintiff appealed Ericson's decision to defendant Juliet Blank-Godlove, Assistant Dean of Students, who summarily affirmed Ericson's decision. Again, it does not appear that plaintiff was given an opportunity to submit any formal written or oral argument. In announcing her decision, Blank-Godlove stated that she could not "find a valid reason for modification or revision" of Ericson's decision and that the "sanctions imposed were compatible with past practice of the University and proportionate to the offense." SAC ¶ 86. Thereafter, on February 18, 2015, plaintiff filed this suit to challenge his expulsion.

### III.

To survive a Rule 12(b)(6) motion to dismiss, plaintiff must set forth "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). The Supreme Court has held that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Importantly, conclusory allegations and formulaic recitation of the elements of a cause of action are insufficient. *Twombly*, 550 U.S. at

6

555. In determining whether the allegations plausibly give rise to an inference of liability, the reviewing court may draw on context, judicial experience, and common sense. *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

### IV.

Count I of the SAC asserts a procedural due process claim pursuant to the Fourteenth Amendment of the U.S. Constitution. To state a procedural due process claim, plaintiff must allege (i) that he possessed a protected liberty or property interest, (ii) that the state or its agents deprived him of this interest, and (iii) that this deprivation was effectuated without constitutionally sufficient process. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). Plaintiff alleges that he possessed both a liberty and a property interest in his continued enrollment at GMU. Specifically, he alleges (i) that he "had a constitutionally protected liberty interest in his good name, reputation, honor, and integrity" and "in pursuing his education, as well as future educational and employment opportunities," SAC ¶¶ 93–94, and (ii) that he "had a constitutionally protected property interest in continuing his education at George Mason University," SAC ¶ 95. Defendants argue that plaintiff's allegations in this regard are conclusory and insufficient to state a claim.

A. Property Interest

It is well-settled that "[a] protected property interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source," most often state law. *Equity in Athletics, Inc. v. Dep't. of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly must have more than . . . a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."). *Goss v. Lopez*, 419 U.S. 565, 573-74 (1975), well

7

illustrates this point. There, the Supreme Court held that a student's enrollment in a public school constituted a property interest based on an Ohio statute's guaranteeing a free education to all residents between 5 and 21 years of age, which created that entitlement. In other words, the plaintiff in *Goss* was able to locate a state law source of a qualifying property interest, namely a statutory claim of entitlement to continued enrollment in public school.

Here, in sharp contrast to *Goss*, the SAC fails to cite or to identify any statute or other source of a legitimate claim of entitlement to plaintiff's continued enrollment at GMU. Instead, the SAC alleges only that plaintiff "had a constitutionally protected property interest in continuing his education at George Mason University." SAC ¶ 95. Although the Virginia Constitution guarantees "a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth,"[4] plaintiff has cited no such basis relating to post-secondary or college education.

This does not end the analysis, as it is necessary to acknowledge and address a cacophony of lower court authority. Some lower courts do not focus sharply on the nature or source of the property interest, but citing *Goss*, simply acknowledge that an interest of some sort exists.[5] Other courts are able to identify a specific source of state law entitlement in post-secondary educational

---

[4] Va. Const. art. VIII, § 1.

[5] *See., e.g., Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 358 (E.D. Va. 2004) ("The Supreme Court has held that academic dismissals implicate a student's liberty or property interests and are thereby protected by the due process guarantee of the Fourteenth Amendment."); *Tigrett v. Rector & Visitors of Univ. of Va.*, 137 F. Supp. 2d 670, 675 (W.D. Va. 2001) ("It is no longer open to question that any expulsion from a state university or college must comport with the Due Process Clause"); *Jones v. Bd. of Governors of Univ. of N.C.*, 557 F. Supp. 263, 267 (W.D.N.C. 1983) ("It is well settled that when a public school or state university takes disciplinary action against a student which, for any substantial length of time, deprives the student of the opportunity to continue his or her education, the school must afford the student due process of law.").

enrollment.[6] And still other courts reject the existence of a protected property interest in enrollment in post-secondary education.[7] In the end, none of these cases is controlling, persuasive, or authoritative here. Instead, what controls is the Supreme Court's *Goss* decision, which holds that a protected property interest only exists when some independent source beyond the Fourteenth Amendment creates that interest. Neither the Supreme Court nor the Fourth Circuit has held that such a property interest exists in connection with higher education, either categorically or specifically with regard to Virginia law. Rather, in cases of this sort, the Supreme Court and the Fourth Circuit have taken the approach of assuming, without deciding, that a person has a constitutionally protectable property interest in enrollment in a state college, university, or other post-secondary educational facility.[8] To assume the existence of a constitutionally protected property interest might be prudent where a case is fit for resolution on the grounds that a plaintiff received constitutionally sufficient process. In such a situation, assuming without deciding the existence of a constitutionally protected property interest allows a court to avoid deciding unnecessary issues. In this case, however, it is far from clear based on the

---

[6] In at least one instance, this state law source of a property interest was simply the common law of contracts. *See Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) (finding that New York law recognizes an implied contract between colleges and their students). *See also Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986) (finding that "[t]he actual payment of tuition secures an individual's claim of entitlement" under Colorado law). It is worth noting that plaintiff neither alleged nor argued that plaintiff's payment of tuition created a property right sufficient to trigger due process protection.

[7] *See, e.g., Newby v. Bon Secours St. Francis Family Med. Residency Program*, No. 14-cv-459, 2014 WL 5465094, at *6 (E.D. Va. Oct. 28, 2014); *Abbas v. Woleben*, No. 13-cv-147, 2013 WL 5295672, at *7 (E.D. Va. Sept. 19, 2013); *McCoy v. E. Va. Med. Sch.*, No. 11-cv-494, 2012 WL 662529, at *2 (E.D. Va. Feb. 28, 2012).

[8] *See, e.g., Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985); *Butler v. Rector & Bd. of Visitors of Coll. of Wm. & Mary*, 121 F. App'x 515, 518 (4th Cir. 2005); *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 73 (4th Cir. 1983).

facts alleged in the SAC that defendants afforded plaintiff constitutionally sufficient process. Accordingly, because the SAC fails to allege the existence of a qualifying property interest, it is appropriate in this case to do as other courts have done,[9] namely to dismiss the claim as insufficiently pled.

Although plaintiff has not yet cited any basis in Virginia law for a protected property interest in his GMU enrollment, it is also appropriate to allow plaintiff leave to amend to attempt to rescue this claim.

B. Liberty Interest

Even if plaintiff cannot rescue his property interest procedural due process claim, he has a second string to his constitutional bow. If he can allege and prove that his expulsion from GMU deprived him of, or injured, a qualifying liberty interest, then he has a valid claim to protection under the Fourteenth Amendment. The question, then, is whether the SAC alleges facts sufficient to support such a claim of a qualifying liberty interest. It does.

A liberty interest in this context encompasses more than "mere[] freedom from bodily restraint." *Roth*, 408 U.S. at 572. Indeed, the Supreme Court long ago made clear that a liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). This reputational liberty interest has also been successfully invoked in school discipline cases, most importantly in *Goss v. Lopez*, 419 U.S. 565 (1975), in which the Supreme Court held that public school students suspended due to allegations of misconduct had been

---

[9] *See, e.g., Nofsinger v. Va. Commonwealth Univ.*, No. 12-cv-236, 2012 WL 2878608, at *6 (E.D. Va. July 13, 2012) ("The Court finds that Nofsinger's pleadings fail to identify a protected property interest."); *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 336 (E.D. Va. 2005) (dismissing claim to property interest where plaintiff had not alleged a state law source for the entitlement and where, at oral argument, neither party could cite such a source).

10

deprived of a liberty interest and were entitled to the protections of the due process clause. In discussing the reputational liberty interest at stake, the Court noted that charges of misconduct "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Id.* at 575.

Nevertheless, "injury to reputation alone does not deprive an individual of a constitutionally protected liberty interest." *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 628 (4th Cir. 2002). Instead, to state a procedural due process liberty interest claim, a plaintiff claiming due process protection must assert that a state actor has injured his reputation or otherwise imposed a reputational "stigma" on him and must also have been deprived of "some more tangible interests." *Paul v. Davis*, 424 U.S. 693, 701 (1976); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment"). Thus, under the liberty interest test announced in *Paul*, which has become known as the "stigma-plus" test, a plaintiff asserting a reputational liberty interest protected by the Fourteenth Amendment must show both (i) the infliction by state officials of a "stigma" to plaintiff's reputation *and* (ii) the deprivation of a legal right or status. *See Paul v. Davis*, 424 U.S. at 710–11; *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (noting that the "stigma plus" test is met if the plaintiff's "reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status").

Defendants contend that the SAC fails to meet this standard, arguing, in essence, that the "plus" of the stigma-plus test must amount to a deprivation of a legal entitlement. In support, defendants rely on *Goss*, noting that the students there had also been deprived of a protected property interest in addition to suffering reputational stigma. This property interest, defendants suppose, constituted the requisite "plus" in *Goss*. And because the SAC fails to allege a basis for

11

a protected property interest, defendants contend that the SAC does not meet the *Paul* stigma-plus test.

Defendants' conclusion misapprehends the scope of the stigma-plus test. First, nothing in Supreme Court or Fourth Circuit precedent supports defendants' view that the "plus"—the deprivation of a legal right or status—must amount in effect to a constitutionally protected property interest. Indeed, caselaw confirms the contrary. For example, the Fourth Circuit has found on more than one occasion that employees terminated from public employment for misconduct possessed a constitutionally protected reputational liberty interest even when that employment was at-will or probationary and thus could not create the legitimate entitlement necessary to constitute a protected property interest.[10] Indeed, to accept defendants' argument that the requisite "plus" must amount to a deprivation of a property right would render liberty interest claims irrelevant, completely swallowed up by property interest claims. Second, expulsion from a public school clearly constitutes the sort of deprivation or change in "legal status" actionable under the stigma-plus test. *See Shirvinski*, 673 F.3d at 315. When analyzing a reputational liberty interest in *Goss*, the Supreme Court essentially said as much when it noted that "[misconduct] charges could seriously damage . . . students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." 419 U.S. at 575.[11]

---

[10] *See, e.g., Sciolino v. City of Newport News*, 480 F.3d 642, 645 (4th Cir. 2007); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 & n.14 (4th Cir. 2006); *Boston v. Webb*, 783 F.2d 1163, 1165–66 (4th Cir. 1986).

[11] *Accord Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (recognizing a protected liberty interest in this context); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (same).

Moreover, the conclusion that expulsion from a public university for misconduct constitutes the deprivation of a legal right or status is consistent with the Fourth Circuit's more developed jurisprudence in the public employment arena. In that context, the Fourth Circuit has long recognized that a liberty interest is implicated by the public announcement of reasons for an employee's discharge.[12] *See Boston v. Webb*, 783 F.2d at 1166. In reaching this result, the court defined the liberty interest as "that of being free from arbitrary restrictions upon the opportunity for other gainful employment stemming from the reasons voluntarily given by government for lawfully terminating . . . at-will public employment." *Id.* at 1167. It is also clear that a qualifying liberty interest is not the interest in the particular government employment that was terminated, but the interest in (i) clearing one's name against unfounded charges and thus (ii) being able to pursue other government or non-government employment in one's chosen field. *See Sciolino*, 480 F.3d at 646; *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990).[13]

Clearly, the consequences and effect of termination from employment for misconduct are the same as the consequences and effect of expulsion from a university. In both contexts—expulsion or termination based on charges of misconduct—interference with an individual's liberty interest in clearing one's name and pursuing employment seem likely to occur. This is particularly so where, as here, charges of sexual assault are involved, as such charges can be devastating and life-altering. In short, the liberty deprivation is the same whether one has been

---

[12] Notably, the Fourth Circuit has interpreted "public announcement" to include even private statements of such reasons if there is "a likelihood that prospective employers or members of the public would see the damaging information." *See Sciolino*, 480 F.3d at 645, 650.

[13] *Cf. Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999) (observing that "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation").

terminated from public employment or expelled from a public university on the basis of serious charges of misconduct.

Thus, the remaining question is whether the SAC adequately alleges a deprivation of a liberty interest. To state a claim, a plaintiff must allege (i) a stigmatizing statement (ii) made public by the public university, (iii) in conjunction with his expulsion from the university, and (iv) that the charge was false. *Cf. Sciolino*, 480 F.3d at 646 (4th Cir. 2007). Notably, a stigmatizing statement is "made public" if there is at least "a *likelihood* that prospective employers or members of the public would see the damaging information." *See id.* at 645 (emphasis added).

These elements are all present in the SAC. Plaintiff has alleged that he was expelled for allegedly violating GMU's sexual misconduct policy, *see* SAC ¶ 77, which "implies the existence of serious character defects such as dishonesty or immorality." *Ridpath*, 447 F.3d at 308 (internal quotations omitted). Plaintiff has also alleged the accusation of sexual misconduct was false. *See* SAC ¶ 57. Most importantly, plaintiff has alleged that he has a liberty interest in his "good name, reputation, honor, and integrity" and that "[u]nless overturned, [his expulsion for sexual misconduct] will remain a part of Plaintiff's permanent educational records and will substantially limit his ability to transfer to another undergraduate institution, attend graduate school, or secure future employment." SAC ¶ 1, 90, 93. In other words, in the absence of the relief sought in this action, there is a likelihood that other persons will come to know of plaintiff's allegedly wrongful expulsion from GMU for sexual misconduct violations.

In sum, expulsion from a public university on charges of misconduct implicates a protected liberty interest under the Fourteenth Amendment. The SAC adequately alleges that plaintiff was expelled because he was wrongly held responsible for sexual misconduct and that

this stigmatizing label will impair his ability to seek further education or employment elsewhere. Accordingly, the motion to dismiss Count I must be denied, as the SAC adequately states a Fourteenth Amendment liberty interest due process claim.

### C. Qualified Immunity

Because the threat of personal liability under 42 U.S.C. § 1983 hangs over the heads of government officials like the sword of Damocles,[14] a well-established principle of federal civil rights litigation is that government officials sued in their personal capacities for violations of federal rights are entitled to qualified immunity if the right was not clearly established at the time of the violation. *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). In other words, if qualified immunity exists—because the constitutional right was not clearly established at the time of the violation—the horsehair holds strong and prevents the sword from falling. And, as a result, government officials can feel more secure in using their authority to engage in activity that one might reasonably think, given existing law, is fully constitutional without the need to worry that a court will come along and impose individual liability after the fact. Thus, in analyzing qualified immunity a court must consider both (i) whether the facts make out a violation of a constitutional right and (ii) whether the right was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 232. Because plaintiff states a plausible claim for relief for a deprivation of a liberty interest without

---

[14] As Cicero explains, Damocles was a sycophant in the court of King Dionysius. One day, after Damocles exclaimed how fortunate Dionysius was, the king offered to switch places with Damocles. Upon taking the throne, however, Damocles found that Dionysius had arranged for a large sword to hang directly above where Damocles sat, held only by a single hair from a horse's tail. Damocles thereafter begged to be allowed to leave the throne, realizing that with great power comes great responsibility and danger. *See* MARCUS TULLIUS CICERO, CICERO'S TUSCULAN DISPUTATIONS; ALSO, TREATISES ON THE NATURE OF THE GODS, AND ON THE COMMONWEALTH 185 (C. D. Yonge trans., Harper & Bros. Publishers) (1888).

due process, the question now is whether this right, as articulated, was clearly established at the time of defendant Ericson's and defendant Blank-Godlove's actions.[15]

Qualified immunity analysis requires three distinct determinations: (i) identifying the right at issue at the appropriate level of generality, (ii) identifying appropriate sources of law that can clearly establish the right, and (iii) resolving whether these appropriate sources of law did, in fact, clearly establish the right at the time of the alleged violation. The right at issue here is the right to be free from a state college, university, or post-secondary educational institution expulsion for misconduct without due process. Thus, defendants sued in their personal capacities can prevail on qualified immunity by showing either (i) that it was not clearly established that due process was implicated in public university discipline cases as they relate to liberty interests or (ii) that the process they provided was not clearly insufficient under established law. Because the first of these logically precedes the second, analysis properly begins there.

The next step of the qualified immunity analysis is to identify the appropriate level of generality. Simply noting that it is well established that the government must afford due process when it deprives someone of liberty would, for instance, be far too general. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999). It is equally clear, of course, that a "materially similar" set of facts is not necessary to establish law clearly for qualified immunity purposes. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (expressly rejecting such a standard). Helpfully, the Supreme Court recently explained that a government official violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear such that every reasonable

---

[15] In light of the plethora of contradicting pronouncements with regard to a protected property interest in higher education enrollment discussed in Part IV-A, *supra*, it is clear that if plaintiff is able to amend his complaint to state a claim for relief on the grounds of a protected property interest, Ericson and Blank-Godlove will be entitled to claim qualified immunity.

official would understand that what he is doing violates that right – in other words, the legal question must be "beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Thus, the question now is whether, at the time of Ericson's and Blank-Godlove's actions, it was beyond debate that students at a public college or university have a protected reputational liberty interest that implicates due process protections in the context of disciplinary hearings.

The next preliminary question is what *sources* of law are sufficient to make the right clearly established. In the Fourth Circuit, the general rule is that only the decisions of the Supreme Court, the Fourth Circuit, and the highest court of the state in which the conduct occurred are relevant. *Doe v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010). When there are no relevant decisions from these courts of controlling authority, the Fourth Circuit will consider "a consensus of cases of persuasive authority" from other jurisdictions, if such exists.[16] *Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004) (citing *Wilson*, 526 U.S. at 617).

Plaintiff suggests that *Jones v. Bd. of Governors of the Univ. of N.C.*, 704 F.2d 713 (4th Cir. 1983), clearly establishes the right within the Fourth Circuit. *Jones*, however, was a remedies case about the granting of a preliminary injunction, and the Fourth Circuit did not there analyze the nature of the protected interest. *See id.* at 714. As a result, *Jones* cannot be read to put beyond debate whether a student at a Virginia college or university has a protectable liberty interest in connection with disciplinary proceedings. Nor does *Goss* put the existence of such a right "beyond debate." First, *Goss* did not address school discipline in the context of college or post-secondary education. Second, a reasonable official could understand *Goss ex ante* as

---

[16] Notably, the Supreme Court has repeatedly reserved the question whether *any* court, other than the Supreme Court, can create clearly established law. *See, e.g., Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (per curiam) (merely assuming that controlling circuit precedent can clearly establish law); *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (same).

requiring the loss of a property interest as a necessary condition to finding the deprivation of a liberty interest. Indeed, defendants argued as much here. To be sure, this argument, as noted *supra*, is unpersuasive, but in order to deny qualified immunity, it is not sufficient to conclude that an interpretation of existing caselaw is unpersuasive: it must be wrong beyond debate.

Plaintiff's claim to a protected reputational liberty interest is built on an analogy to the Fourth Circuit's public employment jurisprudence. Although the right to due process is clear in that context, and although the analogy to that body of law is reasonable, it does not necessarily follow that "every reasonable official" would foresee such an analytical move. *al-Kidd*, 131 S. Ct. at 2083. Indeed, a state college or university official might reasonably conclude that the public employment cases do not control in the college or university setting. In this regard, it is worth noting that the Supreme Court has stressed, in the due process context, that state authority "to prescribe and enforce standards of conduct in its schools" is "very broad." *Goss*, 419 U.S. at 574. This same leniency exists in the First Amendment,[17] Second Amendment,[18] and Fourth Amendment contexts.[19] In short, for constitutional purposes it is not unreasonable to think that

---

[17] As discussed in more detail in Part VII-B, *infra*, in the First Amendment context the Supreme Court has said that application of the legal principles must be done "in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988).

[18] *See D.C. v. Heller*, 554 U.S. 570, 626 (2008) ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on...the carrying of firearms in sensitive places such as schools").

[19] *See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 829–30 (2002) (noting that "special needs inhere in the school context" and that in such context a court's Fourth Amendment reasonableness inquiry "cannot disregard the schools' custodial and tutelary responsibility for children") (internal quotations omitted).

schools are different from other state entities in important regards. Nor is there a clear consensus of persuasive authority from other courts that changes this conclusion.[20]

To be sure, the fact that procedures are in place at GMU to deal with disciplinary issues suggests that defendants Ericson and Blank-Godlove were aware that certain minimum process is necessary. This, however, does not alter the qualified immunity analysis. The mere fact that defendants may have known that procedures were necessary does not mean that they knew or should have known that the procedures were protecting a federal constitutional interest in reputational liberty. Any number of sources could require minimum procedures, including the state constitution, state statute, state administrative regulation, or, indeed, merely the judgment of responsible officials. In light of the law as it existed at the time of the alleged violation, it was not "beyond debate" that certain minimum procedures were necessary for the protection of a federal constitutional liberty interest in the context of disciplinary hearings for students at a state college or university.

Given the absence of clear and settled authority putting the existence of a protected reputational liberty interest beyond debate in the context of state college and university disciplinary hearings, defendants Ericson and Blank-Godlove are entitled to qualified immunity, to the extent they are sued in their individual capacities. The motion to dismiss Count I as applied to these defendants in their individual capacities is, therefore, granted with prejudice.

---

[20] Although the First and Sixth Circuits have recognized that college or university students have a constitutionally protected liberty interest related to their enrollment, the analysis of the issue in these cases is not extensive. *See Flaim*, 418 F.3d at 633; *Gorman*, 837 F.2d at 12. In any event, two decisions do not constitute a consensus for qualified immunity purposes.

## V.

In Count II of his SAC, plaintiff raises a claim pursuant to the substantive component of due process, alleging that defendants' finding that he was responsible for sexual misconduct infringed plaintiff's and Jane Roe's fundamental right "to define the meaning of their sexual relationship, and to set its boundaries." SAC ¶ 117. Specifically, plaintiff alleges that defendant Ericson "disregarded" the BDSM context of the relationship and how it "affected matters like consent and related issues" and treated a BDSM relationship as "*per se* sexual misconduct." SAC ¶¶ 119, 122. In short, plaintiff claims that the decision to apply GMU's sexual misconduct policy to his BDSM encounter with Jane Roe constituted an infringement of his fundamental right to sexual liberty under Supreme Court Fourteenth Amendment precedent. Defendants, in response, argue that plaintiff's asserted right to engage in his chosen mode of private sexual activity is not a fundamental right protected by the Fourteenth Amendment.

The substantive component of the due process clause protects fundamental liberty interests from arbitrary government action. *See Hawkins v. Freeman*, 195 F.3d 732, 749 (4th Cir. 1999). The framework for determining whether liberty interests have been arbitrarily violated varies "[d]epending upon whether the claimed violation is by executive act or legislative enactment." *Id.* at 738 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Where, as here, the government action at issue is an executive act, "[o]nly 'the most egregious official conduct' qualifies as constitutionally arbitrary." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 150 (4th Cir. 2014) (quoting *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 535 (4th Cir. 2012)). Egregious official conduct is that which shocks the conscience and is "unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-

deprivation state remedies." *Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991); *see also Lewis*, 523 U.S. at 846 (holding that "the cognizable level of executive abuse of power [is] that which shocks the conscience"). To illustrate, the forced pumping of a suspected criminal's stomach is conduct which shocks the conscience, *Rochin v. California*, 342 U.S. 165 (1952), but high-speed pursuit of criminal suspects by a police officer in which the officer had no intent to harm the suspects is not, *Lewis*, 523 U.S. 833 (1998).

Whether the executive act was so egregious as to shock the conscience is a threshold question. If the act does not meet this test, "the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest." *Hawkins*, 195 F.3d at 738. Regardless of the merits of plaintiff's asserted liberty interest in his private, intimate associations, plaintiff's substantive due process claim fails because defendants' decision to expel plaintiff falls well short of meeting the "shock-the-conscience" standard. Defendants Ericson's and Blank-Godlove's decision to expel plaintiff does not constitute "conduct intended to injure [the plaintiff] in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849. These officials merely found plaintiff responsible for sexual misconduct in an administrative appeal proceeding, a proceeding that may well have been flawed, but was certainly not so egregiously flawed as to shock the conscience.

Thus, because the SAC fails to plead facts showing an arbitrary executive act that would shock the conscience, defendants' motion to dismiss plaintiff's substantive due process claim must be granted.

## VI.

Count III of the SAC alleges a violation of plaintiff's due process rights under the Virginia Constitution, Va. Const. art. I, § 11. Although the right to due process under the

21

Virginia Constitution is "virtually the same" as the correlative right under the U.S. Constitution,[21] pleading a claim for relief under federal law is not sufficient to establish a claim for relief under Virginia law. In addition to a right, one must have a cause of action by which he can vindicate it. Although 42 U.S.C. § 1983 provides a cause of action to those whose *federal* rights have been violated under color of state law, it does not provide a cause of action for violations of *state* rights. Thus, to state a valid denial of due process claim under the Virginia Constitution, the SAC must identify a cause of action under Virginia law. It fails to do so.

In order to enforce a private right of action under the Virginia Constitution, the provision in question must be self-executing. *See Robb v. Shockoe Slip Found.*, 324 S.E.2d 674, 676 (Va. 1985). Although the due process provision of the Virginia Constitution is "self-executing," this has only been held to be true with regard to *property* deprivation. *See Gray v. Rhoads*, 55 Va. Cir. 362, 2001 WL 34037320, at *5 (City of Charlottesville, 2001) (holding that the Due Process Clause of the Virginia Constitution is "self-executing, but only to the extent of deprivation of property" and collecting cases); *Graham v. Mitchell*, 529 F. Supp. 622, 625 (E.D. Va. 1982) (holding that there is a "common law action" to enforce the Virginia constitutional due process provision as to property deprivations). Plaintiff cites no authority for the proposition that this right is self-executing with regard to liberty interests. Because the SAC only adequately alleges a protected liberty interest, and so far fails to allege a protected property interest, it follows that the SAC's allegation of a Virginia Constitution due process violation fails to state a claim and must be dismissed.

---

[21] *Willis v. Mullett*, 561 S.E.2d 705, 708 (Va. 2002).

## VII.

In Count IV, the SAC alleges that defendants violated plaintiff's First Amendment speech rights by expelling him for sending a text message to Jane Roe in which plaintiff stated that he would shoot himself if she did not respond to let plaintiff know she was alive. Defendants move to dismiss this claim on two grounds. First, defendants contend that the message constitutes a "true threat" that falls outside the scope of First Amendment protection. Second, defendants, citing *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509 (1969), argue that GMU was entitled to punish plaintiff's speech because that speech threatened to interfere "materially and substantially" with the requirements of appropriate discipline in the operation of the school. Both arguments fall short.

A. The "True Threats" Exception

First, it is well-settled that true threats of violence constitute a category of speech falling outside the protections of the First Amendment. *Virginia v. Black*, 538 U.S. 343, 359 (2003). The definition of a true threat is equally well-settled: true threats are "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* True threats may be proscribed consistent with the Constitution because such threats "are words that 'by their very utterance inflict injury.'" *United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012) (quoting *Chaplinski v. New Hampshire*, 315 U.S. 568 (1942)). The Fourth Circuit applies an objective test to determine whether a statement is a true threat. Thus, a statement is a true threat "if an ordinary reasonable

recipient who is familiar with the context ... would interpret [the statement] as a threat of injury." *Id.* (internal quotations omitted).[22]

This standard, applied here, points convincingly to the conclusion that the purported threat at issue does not qualify as a true threat; it did not threaten harm to Roe or to anyone else besides plaintiff. Yet, defendants argue that if plaintiff had followed through on his threat by shooting himself, he would thereby have endangered other students. Deft.'s Br. at 14 ("The firing of a gun inside of [a] dormitory room could not only strike Mr. Doe's roommate, but also other students in neighboring dormitory rooms."). Defendants also argue that "it is not unreasonable to speculate that someone with a gun planning on committing suicide may attempt to harm not only the recipient of the threat but others who might be in proximity to the person threatening suicide." *Id.*

These arguments are unpersuasive; they misapprehend the scope of the true threats exception. The reason true threats are not subject to the protection of the First Amendment is not the harm from the actions threatened but *the threat itself.* To reiterate, true threats are outside the protection of the First Amendment because they are words that "by their very utterance inflict injury." *White,* 670 F.3d at 507. As the Fourth Circuit has explained, the true threats exception is justified by the need to protect people from the fear of violence and the disruption that fear engenders. *See id.* (quoting *R.A.V. v. City of St. Paul,* 505 U.S. 377, 388 (1992)). In other words, a true threat might strike fear in a victim or threaten a breakdown of social order. When a threat of injury is directed at the speaker himself, without an accompanying threat to others, it does not implicate these same concerns; the speaker is presumably unafraid, or at least free of the same

---

[22] Courts are split as to whether true threats should be analyzed using an objective or subjective standard. In *Elonis v. United States,* 135 S. Ct. 2001, 2012 (2015), the Supreme Court had the opportunity to resolve this split but instead chose to decide the case on statutory interpretation grounds. Thus, the Fourth Circuit's objective approach remains undisturbed.

type of fear that would likely give rise to the social disruptions that justify, in part, the existence of the true threats exception. Accordingly, a threat of injury directed exclusively at oneself is not a true threat, and thus falls within the protection of the First Amendment.

B. School Speech

Nevertheless, public schools may proscribe speech without running afoul of the First Amendment if necessary to protect students and to support their educational mission. *See Tinker*, 393 U.S. at 513; *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) ("the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings"). Although courts have made clear since *Tinker* that students do not shed their First Amendment rights at the schoolhouse gate, those rights "must be applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). As already noted, public schools may suppress student speech if they "reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quoting *Tinker*, 393 U.S. at 513)). Furthermore, to determine whether a public college or university may suppress student speech or expression, the expression must be weighed against the "substantial interests inherent in educational endeavors."[23] Importantly, where the speech at issue originates off-campus, school officials may only regulate it if there is "a sufficient nexus with the school." *Kowalski v. Berkeley Cnty. Schools*, 652 F.3d 565, 577 (4th Cir. 2011).

---

[23] *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993); *see also Bethel Sch. Dist. No. 403*, 478 U.S. at 681 (1986) ("The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior.").

Given that the record is currently limited to the factual allegations in the SAC, there is no information concerning the text message's place of origin (*i.e.*, on-campus versus off-campus), nor is there any record as to defendants' justifications for their actions. Thus, the record is not developed sufficiently to allow a consideration and determination whether plaintiff's claim fails as a matter of law. Defendants, of course, may raise this issue on summary judgment and argue, *inter alia*, that relevant university interests justified expelling plaintiff for his speech in this case. At this point, however, defendants' motion to dismiss Count IV must be denied.

C. Qualified Immunity

As with the procedural due process claim, Ericson and Blank-Godlove are entitled to qualified immunity in their individual capacities on the First Amendment claim. Although the current record is too anemic to permit a confident assessment of defendants' argument, it is nonetheless arguable—contrary to the result reached here—that defendants could reasonably have viewed the text message at issue as a true threat. First, there is no Supreme Court or Fourth Circuit authority squarely holding that a threat to oneself cannot be a true threat. Second, the Supreme Court's seminal true threats case defines a true threat as expressing "an intent to commit an act of unlawful violence to a particular individual." *Black*, 538 U.S. at 359. No doubt, a reasonable college or university official viewing this definition could conclude that the unlawful discharge of a firearm at oneself is "unlawful violence" directed at a "particular individual." Third, the Fourth Circuit has emphasized that the true threats exception broadly serves the legitimate purpose of preventing fears of violence and accompanying disorder. *White*, 670 F.3d at 507. In light of the absence of clear and controlling authority to the contrary, a reasonable official could view the Supreme Court's definition of true threat and the Fourth Circuit's statement of the underlying rationale for the true threats exception and conclude that the

government may suppress threats of unlawful violence against oneself for the purpose of preventing broader societal fear of possible violence and disruption. At the very least, such a conclusion was not wrong "beyond debate" at the time of the alleged violation. Accordingly, Count IV is dismissed with prejudice as to defendants Ericson and Blank-Godlove, to the extent they are sued in their individual capacities.

**VIII.**

In Counts V, VI, and VII of the SAC, plaintiff alleges three common law negligence claims. First, in Count V plaintiff alleges that defendants were negligent in their interactions with plaintiff in that they failed "to exercise reasonable care, with due regard for the truth, established procedures, and the important and irreversible consequences of [their] actions" during the adjudication of plaintiff's alleged sexual misconduct. SAC ¶ 140. Second, in Count VI plaintiff alleges that defendants Cabrera and GMU were negligent in their hiring, training, and supervision of Ericson and Blank-Godlove with respect to Ericson's and Blank-Godlove's duties under the sexual misconduct disciplinary process. Finally, in Count VII plaintiff alleges that all defendants were negligent *per se* because defendants breached duties owed to plaintiff under guidelines promulgated by the U.S. Department of Education's Office for Civil Rights ("OCR"), the entity charged with regulating compliance with Title IX.

Defendants contend that dismissal of Counts V, VI, and VII is required on the ground that Virginia has not waived its sovereign immunity for tort suits against its agencies or employees. Although the Virginia Tort Claims Act waives *the Commonwealth's* sovereign immunity in limited situations, none of which is present here, the immunity of the Commonwealth's agencies and those agencies' agents and employees remains undisturbed. *See* Va. Code § 8.01-195.3. Indeed, the Supreme Court of Virginia has specifically found that

27

another public university, the University of Virginia, was an agency of the Commonwealth entitled to immunity in a negligence action. *Rector & Visitors of the Univ. of Va. v. Carter*, 591 S.E.2d 76, 77–79 (Va. 2004). Accordingly, GMU and its agents and employees retain the same immunity from the negligence claims in issue here.[24] Therefore, defendants' motion to dismiss Counts V, VI, and VII must be granted.

## IX.

Count VIII of the SAC alleges discrimination in violation of Title IX. 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be…subjected to discrimination under any education program or activity receiving Federal financial assistance"). Plaintiff appears to assert two theories of Title IX liability: (i) disparate impact resulting from inadequate procedures that disproportionately affect males, SAC ¶¶ 185–192, and (ii) direct discrimination against plaintiff on the basis of his gender, SAC ¶¶ 175–184. Neither theory supports a claim for relief.

### A. Disparate Impact

Neither the Supreme Court nor the Fourth Circuit has squarely decided whether Title IX provides a cause of action for disparate impact. Accordingly, the viability of such a theory of liability turns on the application of first principles of statutory interpretation. In an oft-cited case, the Second Circuit observed that "courts have interpreted Title IX by looking to the body of law developed under Title VI." *Yusuf v. Vassar Coll.*, 35 F. 3d 709, 714 (2d Cir. 1994). This is a sensible approach, for after all, Title IX was enacted as a supplement to the Civil Rights Act of

---

[24] Notably, GMU does not retain immunity for actions pursuant to Title IX because it waives its Eleventh Amendment immunity by accepting Title IX funding. *See Litman v. George Mason Univ.*, 186 F.3d 544, 557 (4th Cir. 1999).

1964, and it mirrors the substantive provisions of Title VI.[25] *Id.*; *see also Cannon v. Univ. of Chicago*, 441 U.S. 667, 694 (1979) ("Title IX was patterned after Title VI"). Importantly, this similarity to Title VI is dispositive here. The Supreme Court has foreclosed disparate impact claims under Title VI. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). It follows that if Title VI does not provide for disparate impact claims then neither does Title IX.[26] Accordingly, to the extent that Count VIII asserts a Title IX disparate impact claim, it is dismissed with prejudice.

### B. Intentional Discrimination

At its core, plaintiff's intentional discrimination claim is that his administrative proceeding resulted in an erroneous outcome as the result of gender-motivated discrimination by the presiding officials. This "erroneous outcome" theory of Title IX liability has been widely accepted following the Second Circuit's decision in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994). Indeed, plaintiff makes much of *Yusuf*, arguing that the SAC alleges the same facts that passed muster in *Yusuf* in addition to alleging the absence of a legitimate non-discriminatory explanation for plaintiff's expulsion. Yet, mimicking the *Yusuf* plaintiff's allegations is not necessarily sufficient to survive a motion to dismiss. Under the Supreme Court's decisions in

---

[25] Title VI, 42 U.S.C. § 2000d *et seq.*, was enacted as part of the Civil Rights Act of 1964 and prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal funds.

[26] Other courts, following this same reasoning, have arrived at this same conclusion. *See, e.g., Doe v. Columbia Univ.*, No. 14-CV-03573, 2015 WL 1840402, at *8 (S.D.N.Y. Apr. 21, 2015); *Weser v. Glen*, 190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002). Although *Litman v. George Mason Univ.*, 5 F. Supp. 2d 366, 374 (E.D. Va. 1998), adopted a contrary view, this pre-dated *Alexander v. Sandoval*, the primary case on which courts now rely in limiting the scope of Title IX liability by rejecting disparate impact claims.

*Twombly* and *Iqbal*, both decided after *Yusuf*, the plaintiff must plead facts sufficient to support a plausible inference of liability. That has not occurred here.

Under *Yusuf*'s formulation of an erroneous outcome claim, a plaintiff must allege (i) particular facts sufficient to cast doubt on the accuracy of the outcome of the challenged proceeding and (ii) particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding. 35 F.3d at 715. Plaintiff has satisfied the first half of that burden by alleging (i) failure to consider witness statements, SAC ¶ 178; (ii) failure to give deference to the reasoned opinion of the initial panel, SAC ¶ 179; (iii) failure to adhere to GMU's own appellate rules, SAC ¶ 180; (iv) failure to make a reliable credibility determination, SAC ¶ 181; (v) failure to afford plaintiff the ability to oppose the granting of an appeal, SAC ¶ 182; and (vi) failure to provide a neutral arbiter without prior involvement in the case, SAC ¶ 183.

However, as to the second half of plaintiff's burden—showing particular circumstances suggesting gender bias as a motivating factor—the SAC is insufficient. As a threshold matter, plaintiff's two allegations that gender bias is the "only" explanation for the outcome of his proceeding are entirely conclusory and entitled to no weight under *Twombly*. SAC ¶¶ 178, 184. Although in total context an inference of gender bias is certainly *conceivable or possible*, the question is whether the SAC's factual allegations make that inference cross the line from conceivable to *plausible*.[27] In this respect, the SAC falls short.

---

[27] For instance, plaintiff argues that "anyone who reads the newspaper knows that OCR is aggressively investigating how universities handle sexual assault cases—and no one has ever suggested they're doing so because schools are being too hard on *men*." Plaintiff's Br. at 26. This may be true, but a motion to dismiss tests the sufficiency of the pleadings, and the SAC does not allege any facts suggesting that plaintiff is being singled out as a man to make a point to the Office for Civil Rights. *Cf. Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 752 (S.D. Ohio 2014) (finding that a plaintiff sufficiently stated a claim under Title IX by alleging that the defendant university was trying to use him as a scapegoat to demonstrate the adequacy of its responses to sexual assault allegations).

In applying Title IX, many courts borrow from the law developed under Title VII and look for allegations such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."[28] Although the caselaw does not state that making these specific allegations is *necessary*, the absence of such allegations, coupled with reliance on mere conclusory statements, constitutes a failure to state a claim. Indeed, even if one accepts that defendant Ericson treated Roe more favorably than he treated plaintiff, it does not necessarily—or even plausibly—follow that it was because plaintiff is a male. As one district court noted recently in a similar case, a number of lawful, independent goals could have motivated any disparate treatment, including a desire to treat complainants with a high degree of sensitivity. *Columbia Univ.*, 2015 WL 1840402, at *12. Or, perhaps, there are less admirable—but still non-discriminatory— explanations for defendant Ericson's decision, such as a lack of common sense. In short, there are a number of possible explanations for any disparate treatment, of which gender-motivated bias is only one. And, in the absence of any specific factual allegations pointing to such a bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable.[29]

Because Title IX does not impose liability for disparate impact, and because the SAC does not allege facts sufficient to support an inference of gender-motivated discrimination, the

---

[28] This quote appears in numerous Title IX cases. *E.g., Yusuf*, 35 F.3d at 715; *Doe v. Washington and Lee Univ.*, No. 14-cv-00052, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015); *Sahm v. Miami Univ.*, No. 14-cv-698, 2015 WL 2406065, at *4 (S.D. Ohio May 20, 2015); *Doe v. Columbia Univ.*, No. 14-cv-03573, 2015 WL 1840402, at *9 (S.D.N.Y. Apr. 21, 2015).

[29] As an example of a successfully pled Title IX claim, the plaintiff in *Doe v. Washington and Lee Univ.*, 2015 WL 4647996, at *10, prevailed over a motion to dismiss because he pled that a school official with "considerable influence" over the challenged proceedings had biased herself by endorsing an article positing that men similarly situated to the plaintiff were in fact guilty of sexual assault.

motion to dismiss Count VIII is granted. Although plaintiff has failed to forecast any facts that would give rise to a plausible inference of gender bias, it is appropriate to allow plaintiff leave to amend his complaint if such facts exist. Plaintiff, of course, should bear in mind the requirements of Rule 11, Fed. R. Civ. P., in determining whether to amend in this regard.

## X.

In Count IX, the SAC alleges essentially the same facts as alleged in support of Count VIII in order to make a claim under the Equal Protection Clause of the Fourteenth Amendment. It follows that Count IX fails for the same reasons that doomed Count VIII; the allegations are insufficient to state a plausible claim. *See Twombly*, 550 U.S. at 556.

Count IX relies on two key facts to support an inference of gender discrimination: (i) that defendant Ericson made a decision against the weight of the evidence, SAC ¶ 196, and (ii) that defendant Blank-Godlove summarily affirmed the erroneous decision, SAC ¶ 197. Based on these facts, the SAC alleges that "the only possible explanation" is bias against the plaintiff because of his "status as a male accused of sexual misconduct." SAC ¶ 197. Again, this conclusion does not *necessarily* follow from the facts alleged. Gender neutral concerns might well have easily—and more plausibly—motivated the challenged actions. Indeed, concerns like sympathy for an alleged victim of sexual assault or a desire to be tough on sexual assault are both more plausible than gender discrimination. In fact, plaintiff draws attention to his status as someone "accused of sexual misconduct," SAC ¶ 197, but then presents no allegation that the treatment he received was different in any way from the treatment and discipline given to a similarly-situated female accused of sexual assault. Simply put, the most reasonable inference to draw from the facts alleged (which do not include any statements or other indicia of gender bias)

32

is that defendants acted based on plaintiff's status as someone accused of sexual assault, a class

that is not entitled to any form of heightened scrutiny under the Equal Protection Clause.

For these reasons, Count IX is dismissed, but, for the same reasons given as to the Title

IX claim, plaintiff will have leave to amend his complaint as to this claim, subject, of course, to

the strict requirements of Rule 11, Fed. R. Civ. P.

## XI.

Finally, Count X of the SAC alleges a violation of the equal rights provisions of the

Virginia Constitution. Plaintiff cites two sources of this right: (i) Va. Const. art. I, § 1 ("all men

are by nature equally free and independent") and (ii) Va. Const. art. I, § 11 (providing for the

"right to be free from any governmental discrimination upon the basis of...sex"). Because these

are state constitutional rights, they are not actionable under 42 U.S.C. § 1983, which by its terms

is limited to federal rights. Accordingly, plaintiff fails to state a claim unless there is an

alternative cause of action at play. There is not.

As already noted, *supra* Part VI, in order to enforce a private right of action under the

Virginia Constitution, the provision at issue must be self-executing. *See Robb v. Shockoe Slip*

*Found.*, 324 S.E.2d 674, 676 (Va. 1985). As the Supreme Court of Virginia has explained:

> "A constitutional provision may be said to be self-executing if it supplies a
> sufficient rule by means of which the right given may be employed and protected,
> or the duty imposed may be enforced; and it is not self-executing when it merely
> indicates principles, without laying down rules by means of which those
> principles may be given the force of law."

*Id.* Thus, even when dealing with a provision of the Virginia Bill of Rights—the provisions of

which are generally self-executing—a Virginia Circuit Court noted that the due process clause of

the Virginia Constitution could only be self-executing with regard to property interests because

"that provision expressly provides a remedy for takings of property." *Gray v. Rhoads*, 55 Va.

Cir. 362, 2001 WL 34037320, at \*5 (City of Charlottesville, 2001). As to life and liberty interests, however, there was no such remedial language, rendering the provision not self-executing with respect to those interests. *Id.* The court reached the same result with regard to Article I, § 1 of the Virginia Constitution. *Id.*

In light of these principles, the equal rights provisions of the Virginia Constitution are not self-executing. A state circuit court has persuasively held, applying the precedent of the Supreme Court of Virginia, that Article I, § 1, is not self-executing because it merely states principles without expressing a remedy. *Id.* And, as to Article I, § 11, the same logic applies: there is no language rendering Article I, § 11, self-executing,[30] and the provision states a principle without a remedy. It follows, therefore, that because neither provision is self-executing, there is no self-executing private right of action to enforce equal rights under the Virginia Constitution.

Even assuming, *arguendo*, that a cause of action for enforcement of equal rights does exist, the Virginia equal rights provision is coextensive with the federal Equal Protection Clause. *See Archer v. Mayes*, 194 S.E.2d 707, 711 (Va. 1973). Accordingly, plaintiff's equal protection claim under state law is insufficient for the same reasons as is his corresponding claim under federal law, namely a failure to allege facts giving rise to a plausible inference that defendants discriminated against him on the basis of gender.

Accordingly, the motion to dismiss Count X is granted.

## XII.

For the above stated reasons, the Order on the motion to dismiss entered on June 26, 2015, shall be amended. Specifically, the motion to dismiss under Rule 12(b)(1) is denied. The

---

[30] When a provision of the Virginia Constitution is self-executing by its own terms, its language makes that plainly clear. *See, e.g.,* Va. Const. art. I, § 8 ("The provisions of this section shall be self-executing.").

motion to dismiss under Rule 12(b)(6) is granted with prejudice as to Counts II (federal substantive due process), III (Virginia due process), V (negligence), VI (negligent hiring, training, and supervision), VII (negligence *per se*), and X (Virginia equal rights). Counts VIII (Title IX) and IX (federal equal protection), however, will be dismissed without prejudice to allow plaintiff an opportunity to amend his complaint and to allege facts sufficient to state a plausible claim for relief. The motion to dismiss is denied with respect to Counts I (federal procedural due process) and IV (First Amendment). As to Count I, plaintiff also has leave to amend for the purpose of stating a claim for a protected property interest. As to the specific defendants, (i) the motion to dismiss GMU as to Counts I and IV is granted and (ii) the motion to dismiss Ericson and Blank-Godlove, in their individual capacities, as to Counts I and IV on the grounds of qualified immunity is granted.

An appropriate order will issue.

Alexandria, Virginia
September 16, 2015

T. S. Ellis, III
United States District Judge