IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JOHN DOE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THE RECTOR AND VISITORS OF )<br>GEORGE MASON UNIVERSITY, ANGEL )<br>CABRERA, *President of George Mason* )<br>*University, sued in his official capacity,* **and** )<br>**BRENT ERICSON and JULIET BLANK-** )<br>**GODLOVE,** *employees of George Mason* )<br>*University, sued in his or her official and* )<br>*individual capacity, jointly and severally*, )<br>)<br>Defendants. )<br>_____) | Case No. 1:15-cv-00209-TSE/MSN |

### PLAINTIFF JOHN DOE'S REPLY BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Plaintiff John Doe submits this Reply Brief in Support of his Motion for Summary Judgment (Mr. Doe's Motion for Summary Judgment, ECF No. 72, is hereinafter referred to as the "Motion."). Defendants' Memorandum in Opposition to the Motion (hereinafter referred to as Defendants' "Memorandum in Opposition")[1] errs in two fundamental ways. First, it conveniently ignores many of the most damning facts that Mr. Doe stated and properly supported in the Statement of Undisputed Material Facts in his Motion (Mr. Doe's "SUMF"). **Indeed, it fails to even include the separately captioned section responding to Mr. Doe's SUMF that is required by Local Civil Rule 56(B).** Second, it misstates the law surrounding Mr. Doe's

---

[1] Defendants' Memorandum in Opposition was filed on January 25, 2016. See ECF No. 84. However, on January 28, 2016, Defendants filed an errata sheet correcting "typographical errors, incorrect cites or missed cites for reference to the record," and attaching a corrected version of the Memorandum in Opposition. See ECF No. 87, 87-1. All references in this Reply Brief are to the corrected version of Defendants' Memorandum in Opposition.

1

procedural due process and First Amendment claims. Accordingly, this Court should (1) consider Defendants to have admitted the facts set out and supported in Mr. Doe's SUMF, and (2) grant Mr. Doe's Motion.

## STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted when there is "no genuine issue of material fact and . . . the movant is entitled to judgment as a matter of law." East West, LLC v. Rahman, 896 F. Supp. 2d 488, 495 (E.D. Va. 2012) (quoting Fed. R. Civ. P. 56(a)). While the moving party "has the initial burden of showing the absence of a material fact[,] . . . [o]nce a motion for summary judgment is properly made and supported, the opposing party must come forward and show that a genuine dispute exists," by "set[ting] forth specific facts showing that there is a genuine issue for trial." Id. (internal quotation marks omitted).

## ARGUMENT

**I. DEFENDANTS' MEMORANDUM IGNORES FACTS MATERIAL TO MR. DOE'S PROCEDURAL DUE PROCESS CLAIMS AND MISSTATES THE LAW SURROUNDING THOSE CLAIMS.**

Defendants simply ignore many of the most damning facts set out and supported in Mr. Doe's Motion regarding his procedural due process claim. Tellingly, Defendants' Memorandum in Opposition does not even respond to Mr. Doe's SUMF in a specifically captioned section—as this Court's local rules require:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. *A brief in response to such a motion shall include **a specifically captioned section** listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated* and citing the parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, *the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.*

2

E.D. Va. Loc. Civ. R. 56(B) (emphasis added). Because Defendants failed to include a "specifically captioned section" addressing the facts that Mr. Doe set out in his SUMF, each of those facts should be deemed admitted. See JDS Uniphrase Corp. v. Jennings, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (Ellis, J.) (holding that the movant's "statement of material facts [was] properly deemed to be undisputed," because the movant had "submitted a properly captioned statement of undisputed facts with appropriate record citations," and the nonmovant had not responded with the specifically captioned section required by Local Civil Rule 56(B) but rather had "responded with a narrative that did not identify with specificity which facts, if any, were disputed").

But even putting aside Defendants' failure to respond in the "specifically captioned section" required by the local rules, Defendants fail to address many of the most egregious facts *anywhere* in their Memorandum in Opposition. The following are just a few of the material facts—set out and fully supported in Mr. Doe's SUMF—that Defendants ignore entirely:

- **Defendant Ericson exchanged no fewer than 18 emails with Ms. Roe** while she was deciding whether to file charges against Mr. Doe—**more contact than he had ever had with any previous complainant.** Pl.'s Mot. for Summ. J. at 6 (SUMF, ¶ 16, citing Ex. 1 at 86:15-88:9; Ex. 10 at 11-18).

- **Defendant Ericson admitted that he had prejudged Mr. Doe's case** before even meeting with Mr. Doe to discuss Ms. Roe's appeal. Pl.'s Mot. for Summ. J. at 8-9 (SUMF, ¶ 37, citing Ex. 1 at 200:3-17).

- **Defendant Ericson told Ms. Roe that he was reversing the panel's decision *two full days* before he told Mr. Doe,** despite clear federal guidance to the contrary, and then—in the interim—**misled Mr. Doe** into believing the appeal had not yet been decided. Pl.'s Mot. for Summ. J. at 9 (SUMF, ¶¶ 38-39, citing Ex. 1 at 128:4-130:21, 242:10-243:7; Ex. 16; Ex. 17).

- Defendant Ericson conducted a *de novo* review of the case, and **substituted his judgment for the panel's as to whether the burden of proof had been met, which he believed was permitted when reviewing for "substantial**

3

> **procedural irregularity."** Pl.'s Mot. for Summ. J. at 9 (SUMF, ¶ 42, citing Ex. 1 at 151:4-14; Ex. 2 at 103:4-18).

As Mr. Doe has noted before in responding to Defendants' Motion for Summary Judgment, Defendants' avoidance of clearly material facts "is as telling as Sherlock Holmes's dog that did not bark: Defendants are quite aware that the procedures employed were utterly inconsistent with the requirements of due process." Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. at 3.

In addition to ignoring facts that are clearly material to Mr. Doe's procedural due process claims, Defendants also misstate the law surrounding those claims. While noting myriad flaws in the process afforded by Defendants, Mr. Doe highlighted four that stood out as impermissible under the due process clause, especially when considered together:

(1) Defendant Ericson failed to provide any reasoning for his unilateral reversal of the panel decision finding Mr. Doe not responsible;

(2) Defendant Ericson found Mr. Doe responsible—for the first time *on appeal*—for alleged incidents of sexual assault of which Mr. Doe received no notice and that were not even adjudicated during the panel hearing;

(3) Defendant Ericson met *ex parte* with Ms. Roe while he was deciding her appeal; and

(4) Defendant Ericson assigned himself Ms. Roe's appeal despite the intolerably high risk of bias created by

(A) his knowledge of Mr. Doe's disciplinary history and confessed desire to have Mr. Doe off campus;

(B) his confessed and unprecedented involvement with Ms. Roe's decision to bring her allegations; and

(C) his admission, during his deposition, that he believed Ms. Roe's allegations from the start **and had even prejudged Mr. Doe's guilt during the appeal**.

Defendants offer transparently erroneous arguments as to why these four glaring flaws are consistent with due process, each of which will be addressed in turn below. But—as if recognizing the utter hollowness of these arguments—Defendants continually return to their core

4

contention: that Mr. Doe "unequivocal[ly] admi[tted]" to violating the Code of Student Conduct. Defendants repeatedly utter this unsupported statement as if it were an incantation that could cure even the most biased and unfair procedures. As Mr. Doe fully explained in his Brief in Opposition to Defendants' Motion for Summary Judgment, see ECF No. 83 at 13-20, the argument not only rests on the false premise that Mr. Doe, in fact, "admitted" to violating the Code of Student Conduct, but it also *highlights* one of the four due process violations Mr. Doe raises in his Motion: Mr. Doe was found responsible—for the first time on appeal—based on supposed admissions to conduct *of which he had never been charged in the first place*. Thus, this argument—like Defendants' arguments with respect to the three other due process violations—is entirely unavailing.

      A.      **Defendant Ericson's Failure to Explain His Reversal of the Panel Decision Deprived Mr. Doe of Due Process.**

In his Motion, Mr. Doe cited a wealth of authority—including Supreme Court and published Fourth Circuit precedent—that not only holds that due process requires decisionmakers to explain their reasoning, but also explains in painstaking detail why this requirement follows from the second factor of the three-factor test in Mathews v. Eldridge, 424 U.S. 319, 335. See Pl.'s Mot. for Summ. J. at 15-20 (citing Wilkinson v. Austin, 545 U.S. 209, 226 (2005), Incumaa v. Stirling, 791 F.3d 517, 534-35 (4th Cir. 2015), and numerous other cases). As the Fourth Circuit explained in Incumaa, the failure to provide reasoning "increases the possibility of an erroneous deprivation," because it (1) "encourages arbitrary decisionmaking" that "risks the possibility that [the government] may single out [a person] for an insufficient reason," and (2) provides "no basis for objection" in a subsequent appeal. 791 F.3d at 534-35. Defendants make no attempt to argue that Defendant Ericson's failure to explain his decision does not implicate the concerns cited in these cases.

5

Instead, Defendants offer two utterly transparent arguments: (1) that "[Defendant] Ericson had ample justification upon which to base his decision," Defs. Mem. in Opp'n at 2; and (2) that Mr. Doe "understood the rationale of [Defendant] Ericson's decision," id. at 3. The first assertion entirely misses the point of requiring an explanation, and would not matter even if the record established it—which it does not. The second assertion is simply belied by the record, which shows that Defendant Ericson never explained his decision—and certainly didn't do so in writing.

**First**, as the record makes clear, *there was no legitimate justification for Defendant Ericson's reversal of the panel decision*. Defendant Ericson's *de novo* review of the case—in which he substituted his judgment for that of the panel on the question of whether the burden of proof had been met, in a review for "substantial procedural irregularity, and found Mr. Doe responsible for allegations of sexual assault *that were never even charged in the first place*—is obviously illegitimate. These actions were not authorized by the University's policies and, as discussed in Part I.B, *infra*, violated Mr. Doe's due process right to notice of the charges against him.

But even if there were some legitimate justification for Defendant Ericson's decision—which went entirely unexplained *at the time the decision was made*—that does absolutely nothing to allay the two concerns giving rise to the explanation requirement in the first place. The fact that *some* justification can be offered *post hoc* does not guard against arbitrary or discriminatory decisionmaking. And the existence of some unwritten, unspoken justification obviously doesn't provide a decision that can be reviewed on appeal (here, to Defendant Blank-Godlove) or before a court.

6

**Second**, the record does *not* show that Mr. Doe "understood the rationale of [Defendant] Ericson's decision." Defs. Mem. in Opp'n at 3. Defendant Ericson certainly "pointed to" what he considered to be Mr. Doe's admissions to uncharged instances of sexual assault during his October 8, 2014, meeting with Mr. Doe. Id. And Mr. Doe certainly stated in that meeting that he "underst[ood] [Defendant Ericson's] logic" with regards to these supposed admissions, but he made quite clear that he didn't agree with it. Id. But it does not follow from either of these facts that Mr. Doe "understood the rationale of [Defendant] Ericson's decision," for one very simple reason: Defendant Ericson did not render his decision until after the October 8 meeting, and did not inform Mr. Doe of the decision until October 10, two days later. See Pl.'s Mot. for Summ J., Ex. 18 (Defendant Ericson's appeal decision letter, dated October 10, 2014). **Defendant Ericson could not explain his "decision" before he had even—as far as Mr. Doe knew— actually made it.**[2]

### B. Finding Mr. Doe Responsible Based on Purported Admissions to Incidents of Misconduct That Were Never Charged in the First Place Violates His Right to Notice of the Charges against Him.

Defendants' argument that Mr. Doe received notice that he was being charged with incidents of sexual assault that allegedly took place on dates other than on October 27, 2013, flatly ignores undisputed facts to the contrary. Defendants fail to say even one word about the following facts—all of which are clearly stated and properly supported in Mr. Doe's Motion:

---

[2] Even assuming *arguendo* that Defendant Ericson had explained his "decision" in the October 8 meeting, an *unwritten* explanation does nothing to allay the concerns giving rise to the explanation requirement. An unwritten decision does not guard against arbitrary or discriminatory decisionmaking because it is completely opaque; a perfunctory or even pretextual explanation can—if unwritten—simply be embellished or denied if the decisionmaker is later questioned. And an unwritten explanation obviously cannot be effectively reviewed in a subsequent appeal or before a court.

- On August 20, 2014, Defendant Ericson informed Mr. Doe—in a letter suspending him from University housing on an interim basis—that he had been informed of Mr. Doe's alleged involvement in an incident of sexual misconduct "that took place *on or about **October 27th, 2013***." Pl.'s Mot. for Summ. J. at 4 (emphasis added) (SUMF, ¶ 6, citing Ex. 4).

- On September 4, 2014, Mr. Doe received a letter from the Office of Student Conduct indicating that it was to serve as the "official notification that [Mr. Doe] ha[d] been accused of . . . alleged violation(s) in the university conduct system *on or around **November 2013***." Pl.'s Mot. for Summ. J. at 5 (emphasis added) (SUMF, ¶ 8, citing Ex. 6).

- The panel made no findings as to any alleged instance of sexual assault other than the one that allegedly occurred on October 27, 2013. Pl.'s Mot. for Summ. J. at 10 (SUMF, ¶ 45, citing Ex. 13 (panel's findings of facts concluding that Mr. Doe and Ms. Roe "engaged in sexual contact *on **10/27/13***," but that Mr. Doe "did not 'deliberately' touch or penetrate [Ms. Roe] without consent") (emphasis added)).

- In writing Mr. Doe to inform him of the panel's decision, Andre Clanton described the hearing as "concerning [Mr. Doe's] involvement in an incident that occurred *on or around **October 27, 2013***." Pl.'s Mot. for Summ. J, Ex. 14.

Instead of addressing the documents in the record that *do* speak to the issue of what Mr. Doe was provided notice of, Defendants try to elide the issue by relying on documents that provide little or no insight into it. These are (1) an August 22, 2014, email from Andre Clanton to Mr. Doe that merely references "an alleged violation to [*sic*] our sexual misconduct policy," see Defs.' Mem. in Opp'n at 3 (citing Pl.'s Mot. for Summ. J., Ex. 5); (2) Ms. Roe's narrative statement, which only describes one incident of sexual assault, which "occurred on October 27, 2013," see Defs.' Mem. in Opp'n at 4 (citing Pl.'s Mot. for Summ. J., Ex. 7); and (3) the recorded telephone conversation in which Ms. Roe refers to no specific incident but simply asks "why [Mr. Doe] never stopped when [she] used the safe word," Defs.' Mem. in Opp'n at 4 (citing ECF No. 82-1, Ex. 9). Because these documents refer to no specific incident other than the October 27, 2013, allegation made by Ms. Roe, they, if anything, only support Mr. Doe's position that he was never charged with other alleged incidents of sexual assault—a position

8

clearly established by the more specific documents discussed above. But if those documents were not enough, there is also Mr. Doe's sworn, uncontradicted testimony:

> [Counsel for Defendants]: Was your understanding of [Ms. Roe's] charges against you for sexual misconduct only related to the incident that occurred on October 27th, 2013?
>
> [Mr. Doe]: I -- yes. The short answer is yes. My -- to my knowledge I was only being charged with the events that occurred on October 27th, 2013.

Pl.'s Mot. for Summ. J., Ex. 19 at 148:14-21.

In an attempt to overcome what the undisputed facts in the record clearly show—that Mr. Doe received no information (like approximate dates of other instances of sexual assault, or the facts surrounding such instances)—Defendants again fall back on their spurious incantation:

> Mr. Doe argues that without context of those other incidents by date or specific events, he cannot put on a meaningful defense. However, Mr. Doe's unequivocal admission that he did, in fact, ignore Ms. Roe's safe word, renders his argument irrelevant. Because Mr. Doe's admissions were unequivocal, the days, locations or the events leading up to these incidents – where Ms. Roe used the safe word and Mr. Doe ignored her – are entirely immaterial. Mr. Doe admitted he heard Ms. Roe withdraw consent, he understood its import, and yet consciously ignored her withdrawal and continued the sexual activity.

Defs.' Mem. in Opp'n at 4.

Again, Mr. Doe fully explained in his Brief in Opposition to Defendants' Motion for Summary Judgment how this argument is refuted by even a cursory review of what Mr. Doe *actually said* in the panel hearing and in his deposition. See ECF No. 83 at 13-17 (quoting in full Mr. Doe's statements in the panel hearing; quoting Mr. Doe's consistent explanation of the those statements in his deposition; noting that the panel was fully aware of the statements and still found Mr. Doe not responsible; and noting that it simply defies common sense that Mr. Doe would "suddenly confess to doing something that he had spent an extraordinary amount of time, energy, and resources steadfastly insisting that he did not do"). But it is instructive to compare Defendants' unsupported assertion above—that Mr. Doe "consciously ignored" Ms. Roe's use of

9

the safe word on these unspecified occasions, with what Mr. Doe *actually said* in the hearing:

> [Panel Member]: Okay. So following up on [another panel member's] question, were there instances outside of October 27th where the word "red" was used and you did not stop?
>
> [Mr. Doe]: They were very rare. They were normally on occasions where we had, um where she was -- it was normally late in the relationship, very late in the relationship where I didn't stop. She -- it was normally an occasion of she being -- had been like it was incredibly sore to beyond my knowledge, she hadn't expressed that she was very sore from activities we had been doing before, and so I was kind of set in the routine of things and I would -- **she would continued [*sic*] for a very short period of time, she would say "red" again and I would stop immediately, but not -- I would not just blatantly ignore and then continue** but it was, um -- they were unusual circumstances. Something like, say, she got her period and she was experiencing pain that she had not expressed to me or something like that where I did not know but it was outside of the norm.
>
> [Panel Member]: Okay.

Pl.'s Mot. for Summ. J., Ex. 12 at 80:3-81:4.  Defendants' repeated assertions that Mr. Doe "unequivocal[ly] admi[tted]" to sexual assault are not just unsupported by the record but are completely refuted by it.  They are nothing short of magical thinking.

>    C.    **Defendant Ericson's *Ex Parte* Meeting with Ms. Roe, During His Review of Ms. Roe's Appeal, Violated Mr. Doe's Right to Due Process.**

Defendants' sole argument as to why Defendant Ericson's unrecorded, *ex parte* meeting with Ms. Roe during the pendency of her appeal "comported with procedural due process" is that "there is nothing in the record to suggest Ms. Roe shared new facts or arguments that wasn't already presented by Ms. Roe in her written appeal." Defs.' Mem. in Opp'n at 5.  Defendants' "no harm, no foul" argument fundamentally misunderstands one reason *ex parte* contacts—particularly ones that are *unrecorded*—are looked upon with great disfavor: because it is difficult to know if such a contact had an impact on the decision rendered, and, if so, what that impact was.  For example, in Furey v. Temple University, 884 F. Supp. 2d 223, 257 (E.D. Pa. 2012), the record did not clearly reveal the effect that an *ex parte* meeting between a school administrator

10

and an eyewitness had on the outcome of a student's disciplinary hearing. But the Court nevertheless found that the *ex parte* meeting was impermissible and vacated the student's expulsion, explaining:

> The [student]-plaintiff did not have the opportunity to hear [an eyewitness'] description of the events . . . . *There is no way to know exactly what [the eyewitness] told [the university administrator] and whether that recitation of events impacted [the university administrator's] decision;* **but when the final decision maker meets with a witness outside the presence of the accused student, the integrity of the process is undermined.**

Id. (emphasis added); cf. also Univ. of Tex. Med. Sch. at Hous. v. Than, 901 S.W.2d 926, 932-33 (Tex. 1995) (noting that information gleaned from an *ex parte* inspection of the scene of the alleged misconduct "was relied upon by the hearing officer in her decision," but also noting that the court was "troubled by the fact that there is *no record of what transpired* during the [*ex parte*] visit").

As in Furey, the record does not reveal exactly what Defendant Ericson gleaned from his unrecorded, *ex parte* meeting with Ms. Roe. See Ericson Aff. (ECF No. 82 at 94), ¶ 2 ("I do not recall that Ms. Roe raised any facts or arguments in [the *ex parte*] meeting beyond what she offered in her written appeal."). But what *is* clear is that the *ex parte* meeting further undermined the integrity of a process that was already extraordinarily flawed and substantially biased in so many other ways.

    **D.**    **Defendant Ericson's *Unprecedented* Amount of Communication with Ms. Roe, His Knowledge of Previous, Unrelated Disciplinary Charges, and His Admission That He Saw Mr. Doe As a Threat Undoubtedly Biased His Adjudication of Ms. Roe's Appeal.**

Discovery revealed the folllowing alarming facts with regards to bias:

- Defendants Ericson and Blank-Godlove were both involved in a campus threat assessment team that had been monitoring Mr. Doe for more than a year and a half before Ms. Roe's allegations arose. See Pl.'s Mot. for Summ. J. at 4 (SUMF, ¶¶ 3-4, citing Ex. 1 at 38:5-40:17; Ex. 2 at 18:13-20:12).

11

- Defendant Ericson admitted that—even before he reviewed Ms. Roe's appeal—he believed Mr. Doe was dangerous and wanted him off campus.  See Pl.'s Mot. for Summ. J., Ex. 1 at 71:14-19.

- Defendant Ericson exchanged no fewer than 18 emails with Ms. Roe while she was deciding whether to file charges against Mr. Doe—*more contact than he had ever had with any previous complainant.*  See Pl.'s Mot. for Summ. J. at 6 (SUMF, ¶ 16, citing Ex. 1 at 86:15-88:9; Ex. 10 at 11-18).

- **Defendant Ericson admitted that he believed Ms. Roe's allegations from the outset.**  See Pl.'s Mot. for Summ. J., Ex. 1 at 97:20-98:4.

- Defendant Ericson assigned himself the task of reviewing and deciding Ms. Roe's appeal.  See Pl.'s Mot. for Summ. J. at 8 (SUMF, ¶ 32, citing Ex. 1 at 103:1-104:10).

- **Defendant Ericson admitted that he had prejudged the case before even meeting with Mr. Doe to discuss Ms. Roe's appeal.**  See Pl.'s Mot. for Summ. J. at 8-9 (SUMF, ¶ 37, citing Ex. 1 at 200:3-17).

Instead of addressing these undisputed facts, Defendants attack straw men by categorizing the facts at high levels of generality and then contending that not every case that fits into one of those general categories is *per se* impermissible.  But that is not what Mr. Doe argues; he does not, for example, argue that no administrator who has any prior knowledge of a student's disciplinary record may be involved in adjudicating his case.  That is not the law, nor would such a requirement be practical on the relatively confined setting of a school campus.  Rather, Mr. Doe argues that the extraordinary circumstances surrounding this case—including Defendant Ericson's unprecedented level of prior involvement, his intimate knowledge of Mr. Doe's history, and his *admittedly* preformed view that Mr. Doe was a threat and that Ms. Roe was telling the truth—indicate, when considered together, not just an *intolerable risk* of unfairness, but certain*, clearly admitted* bias.  See Withrow v. Larkin, 421 U.S. 35, 58 (1975) (holding that, in assessing impartiality, a court may determine from the "special facts and circumstances present in the case . . . that the risk of unfairness [presented by a particular person serving as a decisionmaker] is intolerably high," such that it violates due process).

12

For example, in addressing Defendant Ericson's involvement in the University's campus threat assessment team—as members of which Defendants Ericson and Blank-Godlove had been monitoring Mr. Doe for more than a year and a half before Ms. Roe's allegations arose—Defendants argue:

> Just like a judge who has adjudicated previous criminal charges against a particular individual isn't *per se* partial, subsequently barred or disqualified from adjudicating any future criminal charges with respect to the same individual, both [Defendant] Blank-Godlove and [Defendant] Ericson certainly are not unconstitutionally partial simply because Mr. Doe's previous student conduct history was known by both [of them].

Defs.' Mem. in Opp'n at 7.

Again, Mr. Doe does not contend that *any* previous knowledge of a student's conduct history renders the person with that knowledge "unconstitutionally partial" *per se*. Rather, Mr. Doe contends that Defendant Ericson was aware of three separate incidents—incidents involving weapons and worrying behavior toward a teacher, as well as a comment regarding the Virginia Tech tragedy. While these incidents and the comment were relatively minor when placed in context, Defendant Ericson *admitted* that—based on Mr. Doe's disciplinary history—he considered him a threat *and preferred that he no longer be a student*. Clearly, contending that these and the other circumstances discussed above—together—create an impermissible bias is not "arguing that in student disciplinary proceedings absolute neutrality must be observed." Defs. Mem. in Opp'n at 7. Rather, it is simply acknowledging a bias that Defendant Ericson himself has confessed to under oath.

13

## II. THIS COURT HAS PREVIOUSLY REJECTED DEFENDANTS' CLAIM THAT THE MARCH 2014 TEXT MESSAGE IS NOT PROTECTED BY THE FIRST AMENDMENT, AND DEFENDANTS OFFER NO NEW FACTS THAT SUGGEST A DIFFERENT OUTCOME ON SUMMARY JUDGMENT.

Defendants' sole argument against Mr. Doe's Motion for Summary Judgment on his First Amendment claim is that the March 2014 text message is unprotected by the First Amendment because University administrators could reasonably conclude that the message would "materially and substantially disrupt the work and discipline" of the University. See Defs.' Mem. in Opp'n at 9 (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 513 (1969)). This Court previously determined that Tinker and its progeny did not apply, given the factual allegations set out in Mr. Doe's Second Amended Complaint. See Mem. Op., Sept. 16, 2015 (ECF No. 50) at 25-26. Defendants have offered no new facts revealed in discovery that support a different outcome on summary judgment. They point to three irrelevant facts, none of which they tie to "material and substantial" disruption of University activities: (1) that at the time Mr. Doe sent the March 2014 text message, he was "living on campus in the student dormitories," Defs.' Mem. in Opp'n at 9; (2) a "pattern of disruptive behavior by Mr. Doe on campus," id. at 10-11; and (3) Ms. Roe's status as a student at Northern Virginia Community College ("NVCC"), certain graduates of which are guaranteed admission to the University, id. at 11-12.

First, there is simply no relevance to the fact that Mr. Doe was living in a campus dormitory at the time the text message was sent. The fact that Mr. Doe was living on campus does not establish where the message originated. See Pl.'s Mot. for Summ. J., Ex. 19 at 61:13-21 (Mr. Doe's deposition, in which he stated that he "d[idn't] believe" he was on campus when he sent the March 2014 text message, but that it was "possible" that he was). And nowhere do Defendants explain how the March 2014 text message—sent to Ms. Roe, a non-student—who

14

did not live on campus could "materially and substantially" interfere with the operations of the University, even if made on campus.

Second, Mr. Doe's "pattern of disruptive behavior" is entirely irrelevant to whether *the sending of the March 2014 text message at issue* would materially and substantially interfere with the operations of the University. This argument posits that a school can punish a student's speech when that student has previously been disciplined for unrelated conduct, but that *the same message, sent under the same circumstances*, would be protected if sent by a student with a different disciplinary history. Disparate treatment of student speech on the basis of the student's disciplinary history simply cannot be permissible. A student may punish a student for disruptive behavior, but may not strip his current speech of constitutional protection because he disrupted the school *in the past.*

Third, whether students at NVCC are eligible to complete their degrees at the University is both unsupported by the record and irrelevant. In asserting this fact, Defendants cite to two exhibits ("Exhibit 8, GMU web page regarding Guaranteed Admission Agreements" and "Exhibit 9, GMU 2013-2014 Factbook") that were not attached to Defendants' Memorandum in Opposition. Nor was this fact set forth and properly supported in a specifically captioned statement of material facts, as required by Local Civil Rule 56(B). This Court should not consider the exhibits or the factual assertion the exhibits purportedly support.

But even if it were established that certain students at NVCC are eligible to complete their degrees at the University, Defendants do not explain how this supports their argument that a text message sent to Ms. Roe may materially and substantially interfere with the operations of the *University*, apart from the vague and conclusory assertion that "there is a significant overlap between the schools, and a community of interest among the students at both schools." Defs.'

Mem. in Opp'n at 11-12.  Such an explanation cannot carry the University's heavy burden in demonstrating material and substantial interference with the operations of the school, such that the message may be proscribed under Tinker and its progeny.

## CONCLUSION

For all intents and purposes, Defendants lost this case the moment that Defendant Ericson's deposition ended.  The admissions he made were so extraordinary that they bear repeating here:

- He had more contact with Ms. Roe while she was deciding whether to file charges than he had had with any previous complainant, ever.

- He admitted that he believed Ms. Roe's allegations from the moment he learned of them.

- When a panel of three people who didn't know Mr. Doe found him not responsible after a ten-hour hearing, he assigned himself Ms. Roe's appeal.

- He met *ex parte* with Ms. Roe and all three panel members while the appeal was pending.

- He prejudged Mr. Doe's guilt before even meeting with him and confessed that nothing Mr. Doe could have said during the hearing would have changed his mind.

- During a putative review for "substantial procedural irregularity," he substituted his judgment for the panel's on the issue of whether the burden of proof had been met.

- He told Ms. Roe that he was reversing the Board's decision two full days before he told Mr. Doe, despite clear federal guidance to the contrary.

- He found Mr. Doe responsible for sexual misconduct he was never even charged with.

- He found Mr. Doe responsible for sending a text message simply because it was intended to, and did, hurt the recipient's feelings.

- And he did all of this without ever explaining to Mr. Doe why he did it.

It is literally undisputed that Defendant Ericson admitted to all of these things, under oath and unequivocally, during his deposition.  If that is what due process looks like, then the concept has no meaning on a public college campus.  For these reasons and those stated in Mr. Doe's Motion

16

for Summary Judgment, Mr. Doe respectfully requests this Court grant Mr. Doe's Motion for Summary Judgment and deny the Defendants' separate cross-motion.

January 29, 2016                                                    Respectfully submitted,

                                                                          /s/_____
                                                                          Justin Dillon (Va. Bar No. 48233)
                                                                          Adam R. Zurbriggen (Va. Bar No. 88666)
                                                                          Kaiser, LeGrand & Dillon PLLC
                                                                          1401 K Street NW, Suite 600
                                                                          Washington, DC 20005
                                                                          (202) 640-2850
                                                                          (202) 280-1034 (facsimile)
                                                                          jdillon@kaiserlegrand.com
                                                                          azurbriggen@kaiserlegrand.com
                                                                          *Attorneys for Plaintiff John Doe*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2016, the foregoing Reply Brief in Support of Plaintiff's Motion for Summary Judgment was served on all counsel of record and registered users via the court's electronic filing system.

                                                                                                                                      /s/_____
                                                                                                                                      Adam R. Zurbriggen