IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| JOHN DOE,<br>    Plaintiff, | )<br>) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-209 |
| | ) | |
| THE RECTOR AND VISITORS OF | ) | |
| GEORGE MASON UNIVERSITY, *et al.,* | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff in this Fourteenth Amendment due process and free speech case is a former George Mason University ("GMU") student who was expelled in December 2014 following an administrative process that found him responsible for violating two of GMU's student conduct regulations, one pertaining to sexual misconduct and one pertaining to threats. In response to this expulsion, plaintiff filed the instant action in February 2015 against GMU and three of its officials in their individual and official capacities, alleging violations of various state and federal constitutional rights, state common law duties, and federal law. By Order and Memorandum Opinion dated September 16, 2015, defendants' motion to dismiss plaintiff's Second Amended Complaint was granted in part and denied in part.[1] As a result of this Order, plaintiff's remaining claims are for (i) deprivation of a constitutionally protected liberty interest without due process of law and (ii) violation of plaintiff's right to free speech. The named defendants, sued only in their official capacities, are (i) Angel Cabrera, President of GMU, (ii) Brent Ericson, an Assistant

---

[1] *See Doe v. Rector & Visitors of George Mason Univ., et al.,* No. 15-cv-209, --- F. Supp. 3d ---, 2015 WL 5553855 (E.D. Va. Sept. 16, 2015) (Memorandum Opinion) (Doc. 50); *Doe v. Rector & Visitors of George Mason Univ., et al.,* No. 15-cv-209 (E.D. Va. Sept. 16, 2015) (Order) (Doc. 51).

Dean of Students and Director of the Office of Student Conduct at GMU, and (iii) Juliet Blank-Godlove, Dean of Students at GMU.

This Memorandum Opinion addresses two issues.[2] First, the parties have filed cross-motions for summary judgment on plaintiff's due process and free speech claims. These motions have been fully briefed and argued, and the motions are now ripe for disposition.

Additionally, this Memorandum Opinion provides further explanation of the decision to deny plaintiff's motion to reconsider the ruling on defendants' motion to dismiss. The motion to reconsider, which was denied in a ruling from the bench,[3] sought, *inter alia*, to restore plaintiff's allegation that defendants violated his substantive due process right to sexual liberty, an argument that warrants further elucidation here.

## I.[4]

The facts giving rise to the instant suit began in August 2012, when plaintiff matriculated as a freshman at GMU. Shortly thereafter, plaintiff began a romantic relationship with a woman—referred to pseudonymously as Jane Roe—who was a student at a different university.

---

[2] A third issue also remains pending but will be resolved separately. To date, plaintiff has proceeded pseudonymously pursuant to the order of a magistrate judge. *See Doe v. Rector & Visitors of George Mason Univ., et al.*, No. 15-cv-209 (E.D. Va. Feb. 23, 2015) (Order) (Doc. 6). Defendants filed a timely objection to this order, which was briefed, argued, and taken under advisement pending the development of a full record that would permit an appropriate balancing of the relevant interests. *See Doe*, --- F. Supp. 3d ---, 2015 WL 5553855, at *1 n.1. As the record is now complete, disposition of defendants' objection is appropriate, and a separate order will issue addressing the objection at the conclusion of the litigation.

[3] *See Doe v. Rector & Visitors of George Mason Univ., et al.*, No. 15-cv-209 (E.D. Va. Oct. 2, 2015) (Order) (Doc. 57).

[4] The facts recited here are primarily derived from the parties' statements of undisputed facts submitted as part of their memoranda in support of summary judgment pursuant to Local Rule 56(B). Additional undisputed facts are derived from the summary judgment record. In the few instances where the parties dispute a fact, the dispute is noted and the materiality of the fact is addressed.

This relationship included certain sexual practices known collectively as "BDSM," which is an acronym for the practices it entails, namely bondage, discipline, dominance, submission, sadism, and masochism. Thus, a BDSM relationship might involve as part of the sexual activity such actions as biting, choking, spanking, or the use of restraints. In order to protect Roe, who was the submissive party in the relationship, plaintiff and Roe agreed on a safe word—"red"—that Roe could use to indicate when she wanted sexual activity to cease. According to plaintiff, the ground rules for his BDSM relationship with Roe included that plaintiff should not stop sexual activity unless and until Roe used the safe word. Thus, under the rules of the relationship statements such as "stop" or physical resistance to sexual conduct were not a withdrawal of consent; only the safe word "red" would signal a withdrawal of consent.

While engaged in his relationship with Roe, plaintiff first came to the attention of the GMU administration as a possible threat to student safety. Specifically, in December 2012, a GMU residence life official observed plaintiff carve the words "kill them" into plaintiff's knuckles with a pocket knife. This official intervened and accompanied plaintiff to GMU's psychological services center. During their walk to the center, plaintiff commented that he was glad GMU had officials who would intervene in this way, as such intervention might have prevented the 2007 shooting at Virginia Tech. This incident put plaintiff on the radar of GMU's Campus Assessment and Intervention Team ("CAIT"), which investigates students who might pose a threat to others at GMU. At all times relevant to this action, defendants Ericson and Blank-Godlove were members of CAIT.

The knuckle-carving incident was not plaintiff's only run-in with GMU officials; during the course of his enrollment, plaintiff incurred several disciplinary violations. Specifically, plaintiff was charged for possessing lighter fluid in his dormitory in December 2012. A few

3

months later, in April 2013, plaintiff was sanctioned again, this time for possession of weapons on campus. On this occasion, plaintiff, while in the GMU dining hall, had in his possession both a knife and a "blackjack," a lead-filled, leather-encased blunt force trauma weapon. And then in May 2013, plaintiff was found responsible for interfering with a learning environment by disrupting class. In fact, plaintiff's disruption was sufficiently severe that as part of the sanction he received, plaintiff was ordered to have no contact with the professor of the class plaintiff had disrupted. The members of CAIT were aware of plaintiff's incursions and were watching with concern. Thus, defendants Ericson and Blank-Godlove, as members of CAIT, knew of plaintiff's disciplinary record, and both came to view plaintiff as a threat to GMU.

Despite his disciplinary record, plaintiff remained a student at GMU and progressed to his second year of studies. He also continued to live in the GMU dormitories, and he continued his BDSM relationship with Roe. As such, plaintiff and Roe unsurprisingly engaged in certain of their BDSM activities in plaintiff's dormitory room. One such occasion was October 27, 2013. On that night, Roe went to plaintiff's dormitory room and sexual activity ensued. During this sexual encounter, Roe at one point pushed plaintiff away, but plaintiff continued the sexual activity. At another point, plaintiff asked Roe whether she wished to continue sexual activity, to which Roe responded "I don't know." Plaintiff continued with the sexual activity despite the equivocation, given that Roe did not use the agreed safe word "red."

A few months after the October 27, 2013 incident, plaintiff and Roe ended their relationship. In the following months, plaintiff occasionally attempted to communicate with Roe, often to no avail. One such attempt was a March 2014 text message in which plaintiff told Roe that if she did not respond, then plaintiff would shoot himself. In April 2014, Roe reported incidents of harassment by plaintiff and allegations of the abusive nature of their prior

relationship to her university. Thereafter, in May 2014, Roe reported her allegations to GMU's university police department, which in turn reported the allegations to defendant Ericson. In June 2014, Ericson first met with Roe to discuss Roe's allegations and to inquire whether Roe wished to press administrative charges against plaintiff through GMU's student disciplinary process.[5] From early June through late August of 2014, Ericson and Roe communicated repeatedly, exchanging eighteen emails, which according to Ericson was more contact than Ericson could recall having with any other complainant in the course of a GMU disciplinary proceeding.

Quite apart from her communications with Ericson, Roe also began working with the GMU police. Specifically, in July 2014, Roe cooperated with the GMU police to record a telephone conversation between herself and plaintiff. Over the course of that conversation, Roe asked plaintiff "why [he] never stopped when [she] used the safe word," to which plaintiff replied that he "felt like [she] could handle it." *See* Recorded Telephone Conversation Transcript (D. Mem. Supp., Ex. 9).[6] This recording was eventually used as evidence in a July 2014 hearing before the Fairfax County General District Court in which Roe successfully sought a protective order against plaintiff.

Ultimately, Roe decided to press student disciplinary charges against plaintiff through GMU. Thus, on August 19, 2014, Ericson sent plaintiff an email informing plaintiff that GMU's Office of Student Conduct was "in receipt of a referral for an incident that occurred last semester involving a possible violation of the George Mason University Code of Conduct, specifically with regard to...Sexual Misconduct policy." *See* Aug. 19, 2014 Email (D. Mem. Supp., Ex. 2).

---

[5] Because certain of Roe's allegations related to sexual activity occurring on GMU's campus, GMU had jurisdiction to adjudicate any sexual misconduct plaintiff may have committed during those incidents.

[6] The quoted portion of this conversation was not addressing the events of October 27, 2013.

The next day, a formal letter issued suspending plaintiff from residing in GMU housing owing to plaintiff's "alleged involvement in an incident that took place on or about October 27th 2013 (and continuing) in a George Mason University Residence Hall." *See* Aug. 20, 2014 Letter (P. Mem. Supp., Ex. 4). A few days later, plaintiff received another email from the Office of Student Conduct, this time from GMU official Andre Clanton. *See* Aug. 22, 2014 Email (D. Mem. Supp., Ex. 3). Specifically, Clanton's email informed plaintiff, *inter alia*, (i) that plaintiff was the subject of "an alleged violation to [GMU's] sexual misconduct policy" and (ii) that plaintiff was charged with four violations of the Code of Conduct:

> (1) Infliction of physical harm to any person(s), including self (Code 2013.7.A);
>
> (2) Deliberate touching or penetration of another person without consent (Code 2013.8.A);
>
> (3) Conduct of a sexual nature (Code 2013.8.C); and
>
> (4) Communication that may cause injury, distress, or emotional or physical discomfort (Code 2013.9.B).

*See id.*

One week after Clanton's initial email, plaintiff received a follow-up email containing a narrative statement by Roe describing her allegations and Roe's list of witnesses and evidence, which included the GMU police recording of the July 2014 telephone conversation. *See* Aug. 29, 2014 Email (D. Mem. Supp., Ex. 5). Roe's narrative statement alleged "a number of violent and harassing incidents," including "much distressing communication" from plaintiff from January 2013 through July 2014. *See* Roe Statement (D. Mem. Supp., Ex. 6). Moreover, Roe alleged that "[o]n many occasions, without [her] consent, [plaintiff] forced sex on [her]." *Id.* Importantly, the only instance of alleged sexual misconduct Roe described with any particularity was the October 27, 2013 incident, when plaintiff and Roe engaged in sexual activity in plaintiff's dormitory

room. *See id.* Indeed, Roe described the October 27, 2013 incident as "[t]he most vivid" and the one she wanted GMU "to know most about." *Id.* In addition to the foregoing email communications, plaintiff received "official notification" of his alleged misconduct from Clanton by letter dated September 4, 2014. *See* Sept. 4, 2014 Letter (P. Mem. Supp., Ex. 6).[7] This letter was wholly silent as to what specific conduct was alleged to have constituted a violation of the Code of Conduct, instead referencing only that the "alleged violation(s)" occurred "on or around November 2013." *Id.*

Under GMU policy, allegations of sexual misconduct are adjudicated by a three-member panel of the Sexual Misconduct Board, which consists of GMU faculty members and staff. On September 5, 2014, a panel convened a hearing on the allegations against plaintiff. This hearing lasted ten hours, and both plaintiff and Roe had the opportunity to testify subject to cross-examination, to call witnesses, and to submit evidence. In the course of the hearing, Roe testified as to her allegations about the events of October 27, 2013. Plaintiff, in turn, testified about the BDSM nature of his relationship with Roe, including the rule pertaining to the safe word. In at least one instance, the panel explored the nature of the BDSM relationship by inquiring about events beyond October 27, 2013. Specifically, at one point a panelist asked plaintiff if there were "instances outside of October 27th where the word 'red' was used and [plaintiff] did not stop." *See* Hearing Transcript, 80:4-6 (D. Mem. Supp., Ex. 23). Plaintiff responded that in "very rare" and "unusual circumstances," he would be "set in the routine of things" and Roe would need to say "red" again, at which point plaintiff "would stop immediately." *Id.* at 80:7-21. But as

---

[7] Defendants argue that this exhibit was only a draft communication and was never actually sent to plaintiff. Whether the letter was sent is immaterial. If the September 4 letter was sent, it reinforces plaintiff's argument that GMU failed to provide adequate notice because the letter referred only to a single incident, but the fact that the September 4 letter was not sent would neither undercut plaintiff's case nor bolster defendants' case.

plaintiff explained, upon hearing the safe word he "would not just blatantly ignore and then continue" with intercourse. *Id.* at 80:19-20. On September 12, 2014, the panel issued a decision finding plaintiff not responsible as to each of the four charges against him concerning plaintiff's "involvement in an incident that occurred on or around October 27, 2013." *See* Sept. 12, 2014 Letter (D. Mem. Supp., Ex. 24).

Approximately one week after the panel's decision issued, Roe filed an appeal of the panel's decision that plaintiff was not responsible on all charges.[8] Specifically, Roe alleged that there was a "substantial procedural irregularity" in that the panel found plaintiff not responsible despite the fact that, in Roe's view, plaintiff confessed. It is worth noting here that under GMU policy, in order to justify an appeal a "substantial procedural irregularity" must be identified "by the conduct officer." *See* Code at 17. As defined in the GMU policies, a "conduct officer" is coextensive with a "hearing officer." *See id.* at 4. The hearing officer for plaintiff's adjudication was Clanton, who appears on this record to have played no role in identifying a substantial procedural irregularity. Nevertheless, Ericson permitted Roe's appeal, and Ericson assigned the appeal to himself notwithstanding his prior involvement in the case.

_____

[8] Under GMU procedures, both the accused and the complainant can pursue an appeal based on any of three grounds:

> (1) Information not available at the hearing that, had it been available, would in all reasonable likelihood have produced a different finding;
>
> (2) Substantial procedural irregularity with respect to applicable procedures as determined by a conduct officer; and/or
>
> (3) Perceived hearing officer bias based on factors other than the hearing officer's decision and rationale for such decision.

*See* Code of Student Conduct ("Code"), at 17 (D. Mem. Supp., Ex. 4).

In adjudicating Roe's appeal, Ericson engaged in numerous *ex parte* (and, the summary judgment record suggests, completely off the record) meetings with persons involved. For instance, Ericson met with each of the panelists who had adjudicated plaintiff's case in the first instance. Ericson also met with Roe. Finally, on October 8, 2014, Ericson met with plaintiff. Importantly, Ericson concedes that as of his meeting with plaintiff, Ericson had already prejudged the appeal and decided to find plaintiff responsible for sexual assault.

By letter dated October 10, 2014, Ericson formally announced his decision, finding plaintiff responsible for violating Code 2013.8.A (deliberate touching or penetration of another person without consent) and Code 2013.9.B (communication that may cause injury, distress, or emotional or physical discomfort). As a result of these findings, Ericson imposed the sanction of expelling plaintiff from GMU. Ericson's October 10 letter did not explain the factual basis for his decision or the grounds for reversing the decision of the hearing panel.

On or about October 16, 2014, plaintiff appealed Ericson's decision as improper on the ground that it did not meet the criteria for an appeal under GMU policy. Plaintiff was allowed to pursue this appeal, although GMU had never previously allowed an appeal of an appeal and GMU has never allowed an appeal of an appeal since. Plaintiff's appeal was before Blank-Godlove, the Dean of Students. In the course of her deliberation, Blank-Godlove met separately and off the record with plaintiff (accompanied by counsel), Roe, and Ericson. Blank-Godlove did not review the entire record; rather, she reviewed only those portions of the record identified by Ericson as supporting his decision. On December 5, 2014, Blank-Godlove issued her decision via a form letter that affirmed Ericson's decision on responsibility and the sanction of expulsion. Accordingly, plaintiff's GMU transcript now notes a non-academic expulsion as of December 5, 2014.

Plaintiff commenced the instant lawsuit in February 2015, claiming, *inter alia*, that his expulsion was a denial of due process in various respects. Plaintiff now knows—only as a result of discovery in this action—that the review of Roe's appeal was *de novo* and that plaintiff was expelled for conduct other than what occurred on October 27, 2013.

## II.

Analysis begins with the parties' cross-motions for summary judgment. At issue on these motions are plaintiff's two remaining claims, namely that defendants deprived plaintiff of liberty without due process of law and infringed upon his right to free speech. Each of these counts is addressed separately.

### A.

To prevail on a procedural due process claim, plaintiff must establish (i) that he possessed a protected liberty interest, (ii) that the state or its agents deprived him of this interest, and (iii) that this deprivation was effectuated without constitutionally sufficient process. *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). It is well settled that a liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Nevertheless, "injury to reputation alone does not deprive an individual of a constitutionally protected liberty interest." *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 628 (4th Cir. 2002). Rather, as the Fourth Circuit has explained, in order to constitute a protected liberty interest a "reputational injury [must be] accompanied by a state action that 'distinctly alter[s] or extinguishe[s]' [a] legal status." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012). The Fourth Circuit has further noted that a reputational injury is actionable if there is even "a likelihood that prospective employers or members of the public

10

[will] see the damaging information." *Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007).

Here, the undisputed record facts reflect that plaintiff was expelled from GMU on a charge of sexual misconduct. Such a charge plainly calls into question plaintiff's "good name, reputation, honor, or integrity." *Constantineau,* 400 U.S. at 437. Moreover, plaintiff's expulsion constitutes an alteration of his legal status as a student. *Cf. Sciolino*, 480 F.3d at 649 (termination of employment constitutes a qualifying alteration of status). The record further discloses that plaintiff's transcript bears a notion that he was the subject of a non-academic expulsion. Thus, plaintiff's future educational and employment endeavors, which routinely require disclosure of academic transcripts, may well lead to the public's learning that plaintiff was expelled for misconduct.[9] Although the specific nature of the charge is not disclosed, any reasonable person will conclude that a non-academic justification for an expulsion implies "the existence of serious character defects." *Id.* at 646 n.2 (internal quotations omitted). And if this were not sufficient, the undisputed record reflects that Roe, a member of the general public, was in fact informed that plaintiff was found liable for sexual misconduct by Ericson. Given this analysis, and because plaintiff's expulsion was indisputably a state action, the undisputed record makes clear that state action has deprived plaintiff of a protected liberty interest.

---

[9] In the context of academic discipline, the possibility that a disciplinary violation will "interfere with later opportunities for higher education and employment" is so clear as to almost be a truism. *See Goss v. Lopez*, 419 U.S. 565, 575 (1975); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005) (citing *Goss*). To be sure, plaintiff's disciplinary records are considered confidential under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, but this information can be shared with plaintiff's authorization. Thus, if plaintiff seeks education or employment with institutions or organizations that require disclosure of such records, plaintiff's only options are to forgo opportunities with those institutions or organizations or to authorize the dissemination of records that would likely foreclose plaintiff's ability to pursue such opportunities because of the allegedly defamatory nature of the records.

11

**B.**

The question then becomes whether GMU afforded constitutionally adequate process. In this regard, plaintiff alleges that four distinct but interrelated procedural errors render the process here constitutionally insufficient. First, plaintiff argues that Ericson deviated from established GMU procedures and covered up this deviation by issuing a decision devoid of explanation. Second, plaintiff contends that Ericson's *de novo* review of the record resulted in a finding of responsibility for events about which plaintiff had no notice were in issue. Third, plaintiff objects to the off-the-record *ex parte* meetings that occurred with Roe during the appeal. And fourth, plaintiff argues that Ericson and Blank-Godlove were impermissibly biased decision-makers. Defendants, in turn, argue that plaintiff had adequate notice and opportunity to be heard on the specific facts of this case, namely that plaintiff (in defendants' view) admitted to sexual misconduct.

Analysis of the adequacy of process under the Due Process Clause is governed by the familiar three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The three relevant factors are (i) the private interest that will be affected by the official action, (ii) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (iii) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *See id.* As the Supreme Court cautioned in *Mathews*, "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." *Id.* at 348. Rather, the essence of the due process requirement is that a person should receive notice and an adequate

opportunity to be heard in light of the circumstances at issue. *See id.* at 349. In this respect, due process is "flexible" and context sensitive. *Id.* at 334.

The Fourth Circuit has provided guidance on the application of the principles of *Mathews* in the higher education disciplinary context. Specifically, the Fourth Circuit has embraced the Fifth Circuit's decision in *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961), observing that *Dixon*'s "summary of minimum due process requirements for disciplinary hearings in an academic setting is still accurate today." *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983).[10] In *Dixon*, 294 F.2d at 158, the Fifth Circuit articulated "the nature of the notice and hearing required by due process prior to expulsion from a state college or university." As a general matter, a student threatened with expulsion is entitled to notice that "contain[s] a statement of the specific charges and grounds which, if proven, would justify expulsion." *Id.* And where the charge is misconduct,

> a hearing which gives the...administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required...Nevertheless,...the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to...an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the [administrator] directly, the results and findings of the hearing should be presented in a report open to the student's inspection.

*Id.* at 159. It remains now to apply the principles of *Dixon*, as endorsed by *Henson*, to the adequacy of plaintiff's notice and opportunity to be heard in this case.

---

[10] It is worth noting that although *Dixon* was decided pre-*Mathews*, *Henson* was decided post-*Mathews*, and therefore *Dixon* must be understood in this circuit as consistent with *Mathews*.

**1.**

Analysis properly begins by examining the sufficiency of the notice defendants provided to plaintiff, an issue the parties vigorously dispute. It is undisputed that plaintiff was expelled for sexual misconduct occurring on dates other than October 27, 2013; the disagreement between the parties is whether plaintiff had notice that such dates were in issue. In defendants' view, plaintiff was put on notice that the entirety of his relationship with Roe was in issue at several points in the disciplinary process. Plaintiff contests this characterization, arguing that the only specific notice afforded to him was with regard to the events of October 27, 2013. As *Dixon* makes clear, a public university student accused of misconduct is entitled to "a statement of the *specific* charges" against him. 294 F.2d at 158 (emphasis added). A review of the record reveals that plaintiff's only specific notice here was with respect to the events of October 27, 2013.

The first notice of disciplinary charges that plaintiff received was an August 19, 2014 email from Ericson informing plaintiff that Ericson's office was "in receipt of a referral for an incident that occurred last semester involving a possible violation of the George Mason University Code of Conduct." *See* Aug. 19, 2014 Email (D. Mem. Supp., Ex. 2). This opaque notice can hardly be said to give plaintiff a clear indication of the specific nature of the charge, but importantly the email does suggest by its use of "an incident" that the allegation against plaintiff was limited in scope to a *single* incident. *Id.* Plaintiff received further notice the next day in the form of a letter on GMU letterhead that referenced plaintiff's "alleged involvement in an incident that took place on or about October 27th 2013 (and continuing) in a George Mason University Residence Hall." *See* Aug. 20, 2014 Letter (P. Mem. Supp., Ex. 4). Although the "and continuing" language appears broad, the very next sentence of the letter refers again to a singular

14

"incident." *Id.* Thus, this notice, which bears more traditional indicia of formality, can be said to put plaintiff on specific notice only that the events of October 27, 2013, were in issue.

Plaintiff next received notice from Andre Clanton, Associate Director of GMU's Office of Student Conduct, via an August 22, 2014 email. This email provided no specifics as to the alleged factual basis of the charges, but it once again referenced "an alleged violation" in the singular. *See* Aug. 22, 2014 Email (D. Mem. Supp., Ex. 3). Thereafter, plaintiff received a follow-up email containing a narrative statement by Roe describing her allegations and Roe's list of witnesses and evidence, which included the GMU police recording of the July 2014 telephone conversation. Roe's narrative statement alleged "a number of violent and harassing incidents," including "much distressing communication" from plaintiff from January 2013 through July 2014. *See* Roe Statement (D. Mem. Supp., Ex. 6). Moreover, Roe alleged that "[o]n many occasions, without [her] consent, [plaintiff] forced sex on [her]." *Id.* In defendants' view, Roe's narrative statement is significant because it clearly references multiple alleged incidents of abuse over a lengthy period of time. Yet, the only incident described with *specificity* is October 27, 2013. And importantly, Roe is not a state actor, and her statement therefore cannot put plaintiff on notice as to what incidents the state wished to hold plaintiff accountable. In light of the communications prior to his receipt of Roe's narrative statement, plaintiff very reasonably could have believed that GMU was pursuing charges only for the October 27, 2013 incident. GMU's "official notification" letter dated September 4, 2014, did nothing to remedy the defects; it exacerbated them. *See* Sept. 4, 2014 Letter (P. Mem. Supp., Ex. 6).[11] Specifically, the official notification expressly narrowed the timeframe in issue to "on or around November 2013," a

---

[11] Recall that there is some dispute as to whether this letter was actually sent and received, but that this dispute is ultimately immaterial. *See supra* n.7.

15

timeframe consistent with the representation that the events of October 27, 2013, were exclusively in issue. *Id.*

A fair and careful reading of the transcript of the panel hearing highlights the fact that plaintiff was not on notice as to the scope of the charges against him, as the transcript discloses that the events of October 27, 2013, were the central focus of the hearing.[12] Moreover, following the panel hearing, the letter finding plaintiff not responsible specifically noted that the hearing "concern[ed] [plaintiff's] involvement in an incident that occurred on or around October 27, 2013." *See* Sept. 12, 2014 Letter (D. Mem. Supp., Ex. 24). In short, defendants argue that even though *the panel conducting the hearing* was not on notice that the whole of plaintiff's relationship was in issue, somehow plaintiff was on notice of that fact. Yet, where, as here, the communications plaintiff received repeatedly referenced a single incident and timeframe, and the panel conducting the disciplinary hearing believed that only that same single incident in that same timeframe was before the panel, there can be little doubt that the notice to plaintiff was constitutionally inadequate to inform plaintiff that additional events were charged against him.

Nor was this constitutionally inadequate notice cured at any point during the appeals that followed. Indeed, with respect to Roe's appeal to Ericson, it is undisputed that plaintiff "received no notice that he was being charged with instances of sexual misconduct apart from Ms. Roe's allegations as to what occurred on October 27, 2013."[13] Although plaintiff concedes that he

---

[12] *See, e.g.,* Hearing Transcript, 152:19-20 ("So we're here today talking about the events of October 27th...") (statement by Chairperson Crear).

[13] Plaintiff asserts this as an undisputed fact in his separately captioned statement of undisputed material facts required by Local Rule 56. *See* P. Mem. Supp., ¶ 44. Defendants did not respond to any of plaintiff's undisputed facts in their opposition to plaintiff's motion for summary judgment, so this fact is properly deemed admitted. *See* Local Rule 56(B) ("[T]he Court may assume that facts identified by the moving party in its listing of material facts are admitted,

16

discussed incidents beyond October 27, 2013, with Ericson, that does not cure the lack of constitutionally adequate notice in the circumstances here because the fact that matters are discussed does not constitute notice that the discussed matters are validly in issue.[14] *See* Doe Dep., 140:7-141:6. The same is true with respect to any conversations plaintiff and Blank-Godlove may have had about events beyond October 27, 2013. And it is worth noting that even though plaintiff discussed events beyond October 27, 2013, with both Ericson and Blank-Godlove, plaintiff received no notice in the decisions of either of these officials that the basis for their decisions in any way related to events beyond October 27, 2013.

Simply put, plaintiff was not fairly on notice that events other than those of October 27, 2013, were at issue in his disciplinary hearing. And moreover, such a lack of notice cannot be divorced from the adequacy of plaintiff's opportunity to be heard. *See Flaim*, 418 F.3d at 638 (stating that constitutionally adequate notice must afford "a meaningful opportunity to prepare for the hearing") (internal quotations omitted). To elucidate, the scope and content of the defense plaintiff mounted to the charges against him may have been different had plaintiff had better notice. Specifically, plaintiff has contended, and continues to contend, that in the context of his BDSM relationship with Roe, the circumstances defendants took as admissions of sexual misconduct were in fact consensual. With adequate notice that these admissions were fair game for discipline, plaintiff may have put on additional evidence supplying greater context to his

unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."). All subsequent citations to paragraphs of plaintiff's undisputed material facts should be understood as properly admitted pursuant to Local Rule 56(B).

[14] To be sure, there may have been ways to provide adequate notice. For instance, had an unbiased appellate official informed plaintiff that the appellate review would be *de novo* and cover the entirety of plaintiff's relationship with Roe, such that plaintiff had time to compile a meaningful defense, that notice may well have cured any constitutionally significant deficiency.

statements in order to demonstrate the truth of his contention.[15] Without adequate notice, government officials can attempt, as defendants do here, to construct a *post hoc* justification for their missteps by suggesting that ambiguous phrases—"and continuing"[16]—or vague language— "a number of violent and harassing incidents"[17]—served as adequate notice. Due process will not allow this; the notice must be sufficient to allow an accused student "a meaningful opportunity to prepare." *Flaim*, 418 F.3d at 638. And an opportunity is not meaningful where, as here, the accused student is unaware of the factual bases on which he can be found responsible for a misconduct violation.

Put in terms of the *Mathews* factors, the administrative burden of informing plaintiff formally that the whole of his relationship with Roe could be properly considered was incredibly low—a single telephone call, email, or letter to that effect would have sufficed, even saying perhaps as little as that all events and timeframes referenced in Roe's narrative statement were open to scrutiny. Instead, at almost every turn defendants conveyed the sense that plaintiff could be disciplined, if at all, only for the events relating to October 27, 2013. By conveying a limited scope of focus to plaintiff, defendants prejudiced plaintiff's ability to mount an effective defense, which increased the possibility of an erroneous outcome. Indeed, as the panel hearing and subsequent decision of not responsible on all charges illustrates, context matters with respect to plaintiff and Roe's BDSM relationship. When plaintiff supplied context to the events of October

---

[15] Indeed, the Supreme Court has specifically noted that a student accused of misconduct should "at least have the opportunity to characterize his conduct and put it in what he deems the proper context." *Goss*, 419 U.S. at 584.

[16] Aug. 20, 2014 Letter (P. Mem. Supp., Ex. 4).

[17] Roe Statement (D. Mem. Supp., Ex. 6).

27, 2013, he was acquitted; the same result might obtain as to the other incidents for which plaintiff had no notice he was subject to discipline.

To be clear, the conclusion reached here that plaintiff was not afforded adequate notice should not be taken to suggest that the Constitution requires some particular formula of words or specific means of communication. Rather, the conclusion here is simply that plaintiff received no adequate notice at any point in the proceedings, whether before the panel hearing or after the hearing, that events other than October 27, 2013, were in issue. Had such notice been afforded after the panel hearing, but before the appeal to Ericson, or after Ericson's decision, but before the appeal to Blank-Godlove, such that plaintiff would still be given an opportunity to mount a meaningful defense in at least one stage of proceedings, the notice might then have been constitutionally adequate. But in fact plaintiff had no such notice. In any event, nothing in this decision should be construed as imposing a rigid requirement of meticulously detailed notice at the outset of a disciplinary proceeding. Instead, the dispositive principle as to notice on the undisputed record as it exists here is simply this: Failure to provide clear and specific notice at any point that might allow for a meaningful defense is constitutionally insufficient to provide due process.

**2.**

Quite apart from defendants' constitutionally inadequate notice given to plaintiff, plaintiff also argues that his opportunity to be heard was rife with procedural error. To be sure, plaintiff correctly does not challenge the adequacy of the opportunity to be heard that he received at the panel hearing as to the events of October 27, 2013, as the record here reflects that the process was fully adequate in that respect. Rather, plaintiff aims his attack at the procedural inadequacies that arose only after Roe took her appeal. Plaintiff's attack hits the mark.

Two of the most glaring procedural deficiencies with Ericson's and Blank-Godlove's handling of the appeals were the off-the-record and *ex parte* meetings Ericson and Blank-Godlove had with plaintiff's accuser. As *Dixon* makes clear, where an accused student is not present during proceedings against him, he should be "given...an oral or written report on the facts to which each witness testifies." 294 F.2d at 159. Thus, although meeting with Roe *ex parte* was not by itself constitutionally problematic, the failure to provide plaintiff, at minimum, a report of what transpired during the *ex parte* meetings such that plaintiff could defend himself against Roe's allegations in these meetings fell short of constitutionally adequate due process.[18] Framed in terms of the *Mathews* factors, the low administrative burden of making some record of the *ex parte* meetings and conveying that record to plaintiff could reasonably have reduced the risk of error by (i) putting plaintiff on notice of the full context of the accusations and evidence against him and (ii) affording him an opportunity to respond to those accusations.

No less important is the fact that Ericson never truly afforded plaintiff a meaningful opportunity to be heard in the appeal process. *Dixon* makes plain that an accused student must be afforded an opportunity to present a defense, and a necessary corollary to this requirement is that the opportunity must be meaningful. *See Henson*, 719 F.2d at 74 (noting the importance of "the opportunity to be heard by disinterested parties"). The undisputed record facts reflect that, as of

---

[18] Other courts have similarly concluded that although *ex parte* meetings are not *per se* improper, due process is not afforded when these *ex parte* meetings occur off the record. *See, e.g., Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 932-33 (Tex. 1995) (considering "new evidence" from an unrecorded *ex parte* inspection for which "there is no record of what transpired" violates due process); *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 927-28 (6th Cir. 1988) (presenting "new evidence which had not been presented during the open hearing at which [the accused] and his attorney were present" denied the accused of due process); *Simer v. Rios*, 661 F.2d 655, 680 & n.54 (7th Cir. 1981) (noting that whether *ex parte* contacts are made part of the record is relevant to the due process inquiry); *Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 257 (E.D. Pa. 2012) (lack of opportunity to hear an *ex parte* witness's description of events suggests a lack of integrity of the process and unfairness of the result).

the time plaintiff was allowed to present his defense before Ericson, Ericson admits that he "had prejudged the case and decided to find [plaintiff] responsible" for sexual assault. P. Mem. Supp., ¶ 37 (undisputed fact under Local Rule 56(B)). All the more troubling, Ericson had extensive *ex parte* contact with Roe over the summer of 2014, yet Ericson assigned Roe's appeal to himself rather than to another official with less actual (or even apparent) conflict.[19]

To be sure, defendants correctly point out that there is a well-established "presumption that government officials can and will decide particular controversies conscientiously and fairly." *Boston v. Webb*, 783 F.2d 1163, 1166 (4th Cir. 1986).[20] Thus, the Fourth Circuit has held that an administrative official does not "cease[] to be an impartial decisionmaker simply by virtue of having made a conditional decision...pending further developments in an administrative process." *Morris v. City of Danville*, 744 F.2d 1041, 1044 (4th Cir. 1984). As such, the mere fact that Ericson determined based on his prior involvement in the investigation that plaintiff was

---

[19] Although not dispositive here, it is worth noting that the appearance of impartiality is one of the many facets of procedural fairness. That is, even in the absence of actual bias, the appearance of bias or partiality erodes public trust in the integrity of government institutions. In this respect, the mere fact that Ericson would assign himself an appeal of a case in which he had extensive pre-hearing involvement is troubling, if not independently problematic as a constitutional matter. *Cf. Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 888 (2009) (noting, in the judicial context, that a judge should avoid "even the appearance of partiality...and the appearance of impropriety") (internal quotations omitted).

[20] Defendants further argue that in the specific context of school discipline, "due process is not implicated simply because the disciplinarian observed the conduct, had some knowledge regarding it, or even investigated prior to the hearing." *Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1125 (8th Cir. 2005). Although this point is well taken, it must be noted that the level of impartiality required in the post-secondary context may differ from what due process requires in elementary and secondary schools. After all, most elementary and secondary schools have limited staff, so requiring absolute neutrality would impose significant administrative burdens on the school. Yet, defendants noted at oral argument that GMU has 5,000 employees who could afford plaintiff a hearing. *See* Transcript of Oral Argument (Feb. 5, 2016), 38:14-18. Thus, the administrative burden on an institution like GMU to afford an unbiased decision-maker is much lower than what an elementary or secondary school encounters, and an application of the "flexible" *Mathews* standard should be sensitive to that reality. *See Mathews*, 424 U.S. at 334.

likely guilty is not a constitutionally significant inadequacy. Yet, the record here discloses that Ericson made up his mind so definitively that *nothing* plaintiff might have said at his meeting with Ericson could have altered Ericson's decision. *See* Ericson Dep., 200:13-17. On this record, Ericson had not made a preliminary determination "pending further developments in an administrative process." *Morris*, 744 F.2d at 1044. Rather, Ericson firmly made up his mind without first hearing plaintiff's defense. Although this might not rise to the level of bias on Ericson's behalf in a technical sense, it certainly indicates that plaintiff's opportunity to be heard by Ericson was not meaningful.

Nor does the fact that Blank-Godlove subsequently reviewed Ericson's decision operate to cure the constitutional deficiencies in the process. The undisputed record reflects (i) that Blank-Godlove similarly met *ex parte* and off-the-record with Roe such that plaintiff could not respond to any of Roe's allegations in the meeting and (ii) that Blank-Godlove limited her review to those portions of the record on which Ericson relied. *See* Blank-Godlove Dep., 86:2-88:11. In this respect, Blank-Godlove at best provided a perfunctory review of Ericson's decision and at worst was improperly influenced by *ex parte* communications. Because Blank-Godlove's formal decision letter does not disclose any analysis or explanation for her decision, it is impossible now to determine which was the case.

A few additional irregularities bear mentioning. It is clear from the record that the process afforded to plaintiff included certain deviations from GMU's own established policies and procedures. For one, it does not appear that the hearing officer advising the panel was involved in identifying a "substantial procedural irregularity," which is one of the prerequisites for allowing an appeal. *See* Code at 17. Moreover, it is undisputed that Ericson violated guidance from the U.S. Department of Education's Office for Civil Rights by informing Roe of his

decision to grant her appeal a full two days before informing plaintiff. P. Mem. Supp., ¶ 38 (undisputed fact under Local Rule 56(B)). Although these procedural irregularities, standing alone, would not rise to the level of a constitutional violation, "the accumulation of mistakes" on this record, including "failures to comply" with internal policies, clearly "resulted in a violation of procedural due process." *Furey*, 884 F. Supp. 2d at 259 (finding, based on a totality of errors that included deviations from the university's code, that a university disciplinary process fell short of what due process required).

Defendants argue an important point, namely that it is insufficient to show that constitutionally inadequate process was afforded; plaintiff must also show that the lack of process caused prejudice. *See Graham v. Mukasey*, 519 F.3d 546, 549-500 (6th Cir. 2008). In this respect, defendants argue that because plaintiff admitted to conduct that amounts to sexual misconduct under the Code, Ericson and Blank-Godlove had a sufficient basis from which to find plaintiff responsible. Thus, defendants argue, plaintiff can show no prejudice because the record clearly establishes his guilt.

Defendants' argument as to an admission is belied by the administrative record of the appeal. At the outset, it is important to note that Code 2013.8.A, under which plaintiff was found responsible for sexual misconduct, prohibits "deliberate" touching or penetration without consent. *See* Code at 5. Accordingly, any admission of liability must be an admission of both the *actus reus* of touching or penetration *and* the *mens rea* of "deliberate." Plaintiff testified before the panel that, although there were instances in which he did not stop sexual contact when Roe used the safe word (the *actus reus*), plaintiff "would not just blatantly ignore and then continue" with sex (the *mens rea*). *See* Hearing Transcript, 80:19-20.[21] In other words, plaintiff denied that

he acted deliberately. Although Roe's evidence of the July 2014 telephone conversation recording was to the contrary in that plaintiff responds that he did not stop when Roe used the safe word because he "felt like [she] could handle it," plaintiff testified at his panel hearing that he was simply trying to be agreeable with Roe as part of his attempt to apologize. *See id.* at 74:16-75:18, 166:1-9. Thus, an impartial decision-maker could conclude that plaintiff's explanations were entirely credible and that he did not act with the requisite intent. Given this, therefore, the authorities on which defendants rely are distinguishable. For example, in *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001), the student charged with misconduct admitted the fact in issue to the hearing board directly. The same was true in *Boster v. Philpot*, 645 F. Supp. 798, 801 (D. Kan. 1986), in which high school students admitted their misconduct directly to the school's principal. Here, plaintiff denied the relevant fact—the mental state of "deliberate"—before the panel and before Ericson. *See* Hearing Transcript, 80:19-20 (denial before the panel); Doe Dep., 140:19-143:4 (denial before Ericson).

Beyond the foregoing distinction between the instant case and defendants' cited authorities, it is also relevant that the *contexts* are entirely different. That is, *Watson* and *Boster* are both about high school students who committed straightforward offenses and incurred punishments that were not life altering. In *Watson*, 242 F.3d at 1239, the student was expelled after admitting to assaulting his roommate, and in *Boster*, 645 F. Supp. at 800, the students were briefly suspended after committing vandalism. Unlike high school students, who in a great many states are entitled to public education, plaintiff has no such guarantee with respect to post-secondary education. Thus, unlike high school students, plaintiff's lost opportunity to continue

---

[21] Plaintiff continues to contend here that any violation of the safe word rule in his relationship with Roe was unintentional. *See* Doe Dep., 118:13-19.

with his post-secondary education, coupled with the possibility that he may be unable to pursue meaningful educational opportunities elsewhere while his name remains associated with sexual misconduct, inevitably affects plaintiff's professional prospects. Moreover, unlike the assault in *Watson* and the vandalism in *Boster*, whether plaintiff committed sexual misconduct turns on Roe's consent, a complicated factual determination made all the more complex and nuanced by the unorthodox rules of plaintiff and Roe's BDSM relationship. And common sense suffices to understand that an adjudication of responsibility for sexual misconduct carries a much more powerful stigma than an adjudication of run-of-the-mill assault or vandalism. Given that the facts, contexts, and consequences of the instant case are so different from those in *Watson* and *Boster*, it is unsurprising that the requirements of due process are different here. Simply put, defendants' actions here are not justified by their contestable claim that plaintiff admitted guilt. Plaintiff did not confess with such clarity that it is inescapable that any rational fact-finder would find him responsible for sexual misconduct regardless of the procedural protections in place. This conclusion is sufficient to establish that plaintiff was prejudiced by the constitutional infirmities in the process defendants provided to plaintiff here.

### 3.

In sum, the undisputed record facts disclose that plaintiff was deprived of reputational liberty without due process of law. Throughout the disciplinary process, plaintiff was led to believe that he was charged with conduct violations for a single incident, namely the events of October 27, 2013. After his acquittal by a panel, plaintiff was subjected to an appellate process before an administrator who deviated from internal policy by using an alleged procedural irregularity to justify a *de novo* review of the facts, again without informing plaintiff of the scope of the review. More problematically, the administrator conducting the *de novo* factual review

met *ex parte* and off the record with plaintiff's accuser. This administrator then found plaintiff liable and imposed sanctions upon him without providing a basis for the decision. When plaintiff appealed this decision to a higher-level administrator, the second level of appellate review proved to be little more than a rubber stamp of the decision below, focusing the inquiry on those parts of the record that supported affirming a finding of responsibility and the imposition of a sanction and once again possibly considering matters presented *ex parte* and off the record by plaintiff's accuser. It is worth noting also that certain key facts about the process afforded to plaintiff are known only because of discovery in this action. For instance, only now is it clear that the "procedural irregularity" on which Ericson relied to justify the appeal was the initial panel's failure to consider statements by plaintiff concerning events outside of the October 27, 2013 incident. Moreover, only now is it known that Ericson's review was *de novo*, such that Ericson substituted his own judgment for that of the initial panel. In this respect, it is clear that the failure to explain the disciplinary decision concealed other more severe procedural deficiencies, thus compounding the errors.

The narrowness of the conclusion reached here warrants emphasis. The procedural inadequacy on this record was not the failure to provide a specific form of notice or the failure to structure proceedings in a particular manner. Rather, the conclusion reached here is simply that due process is violated where a state-run university (i) fails to provide notice of the full scope of the factual allegations in issue in a disciplinary proceeding, (ii) deviates from its own procedures in permitting an appeal of a finding of no responsibility, (iii) conducts a *de novo* administrative review of the charges without affording an adequate opportunity to mount an effective defense, including by holding off-the-record and *ex parte* meetings with the accuser, and (iv) fails to provide a basis for its decision such that meaningful review can occur. This conclusion is

consistent with *Dixon*, which requires specific notice of the charges, a meaningful opportunity to present a defense, and notice of results and findings. *See* 294 F.2d at 158-59. Whether the absence of any one of the foregoing identified procedural errors would result in a different outcome, namely a finding of constitutionally adequate process, need not be reached or decided. Accordingly, the result reached here should not be understood as requiring a state-run university to provide any *specific* (i) form of notice, (ii) set of internal rules, (iii) method of conducting hearings, or (iv) form of a final decision. Rather, the procedural violation here was the compounding of the absence of specific notice as to the full scope of the events in issue, the clear deviation from established policies, the failure to provide adequate assurances of proper decision-making on appeal, and the absence of a final decision that permits meaningful review.

A final point merits mention. In the employment discrimination context, it is now well settled that federal courts should not sit "as a kind of super-personnel department weighing the prudence of employment decisions." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). The same is no less true in the context of reviewing university discipline; the question is not one of prudence, but one of lawfulness. Defendants have painted a picture of plaintiff portraying him as disturbed, depraved, and dangerous, such that it is good that he was expelled. Whether this is true is immaterial to the matter at hand, as the Due Process Clause of the Fourteenth Amendment is not concerned with ends but with means. In other words, it may well be that plaintiff deserves to be expelled or otherwise sanctioned for certain behavior, but the Constitution requires that if behavior is to be sanctioned, then the state must ensure the soundness of the decision it reaches as the situation requires. At almost every critical turn, GMU had low-cost and low-burden options at its disposal that would have vindicated plaintiff's due process right. With adequate notice, an appellate reviewer who would hear plaintiff out with an

27

open mind, and the avoidance of off-the-record *ex parte* meetings with the accuser, the outcome here might well be different. But where the accused has this much at stake, as in the context of university discipline of this magnitude, the compounding of errors that could easily and cheaply have been avoided renders the risk of unfairness "intolerably high." *Withrow v. Larkin*, 421 U.S. 35, 58 (1975) (observing that due process is violated where the "facts and circumstances" of a particular case demonstrate that "the risk of unfairness is intolerably high").

Accordingly, on Count I plaintiff's motion for summary judgment must be granted and defendants' motion for summary judgment denied.

**B.**

Because defendants deprived plaintiff of a protected liberty interest without due process, analysis now turns to the issue of a remedy for this improper deprivation. Plaintiff proposes that defendants (i) should be enjoined from enforcing their sanction against plaintiff, (ii) should be enjoined from maintaining any record that plaintiff committed misconduct with respect to Roe's allegations, (iii) should be enjoined from imposing any sanction or punishment for any conduct occurring, or allegedly occurring, before the date of judgment, and (iv) should be required to reinstate plaintiff as a student in good standing at GMU. Defendants, in turn, propose that plaintiff should be afforded at most a new hearing. Neither party's position in this respect has been adequately briefed or argued, and it is clear that such briefing would aid the decisional process. At this point, however, a few clear principles merit mention to guide the briefing.

Any remedy will be equitable in nature, as each defendant is named in his or her official capacity. And, as the Fourth Circuit has explained, "[o]ne of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life." *Bowen v. Hockley*, 71 F.2d 781, 786 (4th

Cir. 1934). Thus, it is clear that a remedy must be shaped to do justice on the specific facts of the instant case. Accordingly, the recognition that defendants did not afford constitutionally adequate process to plaintiff does not necessarily require turning a blind eye to GMU's representation that in the judgment of GMU's administrators plaintiff poses a threat to the GMU community based on the totality of his actions and disciplinary violations. It may well not do justice to force GMU to place its community of students, faculty, and staff at potential risk if plaintiff did in fact commit misconduct simply because "the constable has blundered" in the first round of process. *New York v. Defore*, 242 N.Y. 3, 21 (1926) (Cardozo, J.) (famously criticizing the exclusionary rule). Plaintiff was expelled on serious charges, and serious charges require careful attention to the adequacy of the process, but defendants' failure to vindicate plaintiff's rights in the first instance does not necessarily require a judicial order preventing GMU from vindicating its community's right to a safe environment by enjoining the further adjudication of these serious misconduct charges.

At this stage, one thing is perfectly clear: plaintiff was expelled because of (i) alleged sexual misconduct occurring on dates other than October 27, 2013, and (ii) a text message sent in March 2014 threatening suicide, allegations that were not adjudicated through a constitutionally adequate process. Accordingly, there can be no doubt that it is appropriate here to vacate the decisions of defendants Blank-Godlove and Ericson and to order that plaintiff be reinstated as a GMU student in good standing.[22] Indeed, defendants do not appear to contest this. Thus, the key

---

[22] Because such reinstatement may require action or approval by defendant Cabrera, he may be a necessary party to this litigation even though he was not personally involved in plaintiff's disciplinary proceedings. *See Stroud v. Benson*, 254 F.2d 448, 452 (4th Cir. 1958) ("Equally certain and confirmed by authority is the rule that if the judgment or decree granting the relief sought will require the superior officer to take action, either directly or through a subordinate, he is an indispensable party."). Yet, even if Cabrera is necessary his dismissal may be appropriate if

29

questions in crafting a remedy appear to be (i) whether GMU should be allowed to pursue a new round of disciplinary hearings, (ii) if so, what allegations occurring before the date of judgment should be open for adjudication, and (iii) whether there should be any restrictions on the means by which the new disciplinary hearings, if any, are to be carried out, *e.g.*, enjoining Ericson and Blank-Godlove from participating.

In sum, it is clear that plaintiff must be reinstated as a student in good standing at GMU at least until new process is afforded, if such process is allowed. But the issues identified here—and perhaps other issues that the parties deem relevant—would benefit from further briefing. Accordingly, an Order will issue setting a briefing schedule on the issue of an appropriate remedy.

## C.

The remaining count at issue on the parties' cross-motions for summary judgment is Count IV, in which plaintiff alleges that defendants infringed on his freedom of speech.[23] Specifically, plaintiff was sanctioned, in part, for sending a text message to Roe in which plaintiff said that if Roe did not respond, plaintiff would obtain a gun and shoot himself in the chest. Ericson and Blank-Godlove (but not the hearing panel) found this text message to be a

---

proper relief can be afforded without his being named, perhaps under the All Writs Act, 28 U.S.C. § 1651(a). *See United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (holding that an innocent third party "could…be permissibly compelled" to assist where the third party is not "far removed from the underlying controversy"). The parties should address whether relief can be afforded if Cabrera were dismissed.

[23] Because plaintiff challenges the action of Virginia officials, his constitutional claims arise under the Fourteenth Amendment, which provides that "[n]o state shall…deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. The Supreme Court has long recognized that the freedom of speech is "among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

"communication...likely to cause injury, distress, or emotional or physical discomfort" under Code 2013.9.B. The question here is whether this determination and the subsequent imposition of punishment were consistent with the Constitution.

It should be noted at the outset that resolution of the free speech question is arguably moot here in light of the conclusion that defendants deprived plaintiff of liberty without due process of law. Indeed, as the discussion of a remedy in Part II-B, *supra*, illustrates, plaintiff is entitled to have his finding of responsibility vacated on procedural grounds. Because the remedy for the due process violation affords the same relief sought under Count IV, namely the vacating of the decision of responsibility and reinstatement as a student in good standing, resolution of the free speech question would not afford any additional meaningful relief, particularly because plaintiff does not seek a finding that Code 2013.9.B is facially unconstitutional. Indeed, a leading treatise notes that an "unspoken consideration[]" in applying the mootness doctrine is "the importance of the underlying legal issues." 13C Wright & Miller, <u>Federal Practice and Procedure</u> § 3533.3.1 at 83 (3d ed. 2008). In this respect, "[i]t may...be important to defer decision until a pressing need for an available and effective remedy justifies resolution of a difficult question." *Id.* Where, as here, a plaintiff is entitled to reinstatement in good standing on procedural grounds alone, there is no "pressing need" for a remedy on the basis of a substantive constitutional violation as well. *See id.* Yet, for the sake of completeness the free speech issue is addressed, but only as an alternative ground for relief.

Analysis properly begins with the text of the provision under which plaintiff was found responsible for misconduct. Code 2013.9.B provides, in relevant part:[24]

---

[24] *See* Code at 5-6.

> Acts of misconduct include…[a]ll hostile, threatening, or intimidating behavior that by its very nature would be interpreted by a reasonable person to threaten or endanger the health, safety or well-being of another. Examples for such behavior may include…b) Communicating…either directly or indirectly…by…electronic or written communication in a manner likely to cause causes [sic] injury, distress, or emotional or physical discomfort is also prohibited [sic].

The first half of the provision cited above clearly evidences an intent to ban "true threats," which constitute a well-settled exception to the freedom of speech protected by the First and Fourteenth Amendments. *See Virginia v. Black*, 538 U.S. 343, 359 (2003). Indeed, the first half of the provision in issue is tailored to be entirely consistent with the Fourth Circuit's law on true threats, in that Code 2013.9 prohibits only behavior (including speech)[25] that "an ordinary reasonable recipient who is familiar with the context…would interpret as a threat of injury." *United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012).

The constitutional problem presented here arises from Code 2013.9.B, which "also prohibit[s]," *inter alia*, "[c]ommunicating…by electronic communication in a manner likely to cause causes [sic] injury, distress, or emotional or physical discomfort." There can be no doubt that this language is susceptible to an interpretation that "[pen]alizes a substantial amount of protected expressive activity," *e.g.*, offensive speech. *United States v. Williams*, 553 U.S. 258, 297 (2008). Indeed, Code 2013.9.B's plain language imposes no "reasonable person" limitation and covers such vague effects as "distress" or "emotional…discomfort." In that respect, under a reasonable interpretation of Code 2013.9.B, the provision penalizes speech that an individual finds offensive or disagreeable. As defendant Ericson expressed in his deposition, in his view Code 2013.9.B is broad enough to permit disciplinary action against a student who expresses a racist view that African-Americans should not be permitted to enroll at GMU and thereby upsets

---

[25] *Cf. McCauley v. Univ. of the V.I.*, 618 F.3d 232, 250 (3d Cir. 2010) ("Speech protected by the First Amendment is a type of 'conduct,' as it is a personal behavior.").

an African-American student. *See* Ericson Dep., 173:3-15. Yet, it is well established that racist speech, even on a university campus, is constitutionally protected. *See, e.g., IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993) (recognizing that despite a university's "responsibility" to maintain "an educational environment free of discrimination and racism," such goals should be accomplished "in some fashion other than silencing speech on the basis of its viewpoint").

Although Code 2013.9.B's plain language reaches beyond the true threats exception, defendants alternatively argue that the restriction is justifiable in light of *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503 (1969).[26] Under *Tinker*, 393 U.S. at 513, a public school may proscribe speech without running afoul of the constitutional right to free speech if necessary to protect students or to support the educational mission. Thus, public school officials may suppress student speech if they "reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quoting *Tinker*, 393 U.S. at 513). As the Third Circuit has persuasively illuminated, the exact manner in which *Tinker* applies in the university setting "is difficult to explain" and likely evades "any broad categorical rules." *McCauley*, 618 F.3d at 247. Instead, the teachings of *Tinker* and its progeny in the elementary and secondary school settings should be "scrutinized carefully" before

---

[26] At the motion to dismiss stage, the question whether *Tinker* applies in this case was reserved pending a more developed factual record. *See Doe*, --- F. Supp. 3d ---, 2015 WL 5553855, at *14. This decision assumes, *arguendo*, that *Tinker* applies in the context of post-secondary education. Although the Fourth Circuit has cited *Tinker* as authority in post-secondary education speech cases, the Fourth Circuit has not squarely addressed whether and to what extent *Tinker* applies in such contexts. And moreover, the Supreme Court's post-*Tinker* jurisprudence casts some doubt on whether *Tinker* and its progeny apply to post-secondary schools. *See, e.g., Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large.").

being applied to universities, "with an emphasis on the underlying reasoning of the rule to be applied." *Id.* This sensible conclusion recognizes the many differences between post-secondary institutions on the one hand and elementary and secondary schools on the other; that which might "materially and substantially disrupt" an elementary or secondary school could be fundamental to universities.

To understand these material differences, an appropriate starting place is the Fourth Circuit's characterization of the unique role of universities in society. Specifically, the Fourth Circuit has observed:

> [I]ndividual sovereignty…can only be attained by encouraging the individual to think independently. Independent thinking, in turn, can only be developed through constant questioning, the expression of new, untried and heterodox beliefs and the willingness to tolerate experimentation—in sum, the traditions upon which the first amendment rests. It follows that our schools, particularly our universities, must serve as great bazaars of ideas where the heavy hand of regulation has little place. Like other bazaars, they may seem rude, cacophonous, even distasteful at times; but they are necessary predicates to the more orderly market of ideas in our public life.

*Kim v. Coppin State Coll.*, 662 F.2d 1055, 1064 (4th Cir. 1981). In short, controversial and sometimes offensive ideas and viewpoints are central to the educational mission of universities. It follows that university students cannot thrive without a certain thickness of skin that allows them to engage with expressions that might cause "distress" or "discomfort," which is precisely the type of speech that Code 2013.9.B seeks to suppress. The coddling of the nation's young adults by *proscribing* any expression on a university campus that is likely to be distressing or discomforting does not protect "the work…of the school;" such rules frustrate the mission of the university. *See Morse*, 551 U.S. at 403 (noting that schools can proscribe speech that disrupts a school's educational goals); *Kim*, 662 F.2d at 1064 (identifying the goals of universities).

34

In *Sword v. Fox*, 446 F.2d 1091, 1097 (4th Cir. 1971), the Fourth Circuit, relying in part on *Tinker*, articulated the criteria for evaluating the reasonableness of regulations on university speech. Specifically, such regulations must (i) "measurably contribute[] to the maintenance of order and decorum," (ii) be "calculated to prevent interference with 'the normal activities of the University' or obstruction of its function 'to impart learning and to advance the boundaries of knowledge,'" or (iii) be "important in maintaining 'order' and 'normal operations'." *Id.* (some internal quotations omitted). Importantly, the Fourth Circuit's appeal to "order" was called into question the following year, when the Supreme Court held in *Healy*, 408 U.S. at 180, that "the acknowledged need for order" does not mean that "First Amendment protections should apply with less force on college campuses than in the community at large." Thus, analysis properly focuses on the extent to which a regulation prevents interference with the functions of the university. In engaging in the required analysis, it is helpful to bear in mind, as the Third Circuit has articulated, the unique aspects of post-secondary institutions that set them apart from elementary and secondary schools. For instance, there are "differing pedagogical goals" for each; post-secondary institutions do not operate *in loco parentis*; the disciplinary needs of post-secondary institutions differ; post-secondary students are adults with greater maturity; and "many university students reside on campus and thus are subject to university rules at almost all times." *McCauley*, 618 F.3d at 242-43.

Viewed against the backdrop of these principles, Code 2013.9.B is similar to the university speech code provision held unconstitutionally overbroad in *McCauley*. There, the court concluded that a policy restricting speech that may "frighten, demean, degrade, or disgrace," although it encompassed certain speech that would qualify as unprotected fighting words, also "encompass[ed] much more speech than that which could reasonably be found to

cause a threat of substantial disruption." *McCauley v. Univ. of the V.I.*, 52 V.I. 816, 849 (D.V.I. 2009). Like the provision struck down in *McCauley*, Code 2013.9.B purports to cover *all* student speech—regardless whether it occurs on campus—and uses entirely subjective standards such as "distress." *Cf. id.* at 847. As the *McCauley* court correctly noted, "some people may feel [distressed] by a comment that other students find perfectly acceptable." *Id.* Accordingly, the natural incentive under a regime like that created by Code 2013.9.B is to speak less for fear of "distress[ing]" or "discomfort[ing]" another.

It is untenable to suggest that a regulation as broad as Code 2013.9.B is necessary to "prevent interference" with the normal operations of a university. *See Sword*, 446 F.2d at 1097. Nor can defendants proffer a justification for a regulation that sweeps so broadly. Code 2013.9.B does not advance the university's pedagogical goal of serving as a "great bazaar[] of ideas;" rather, it is likely to stifle the expression of unpopular opinions for fear that another will become "distress[ed]" or "discomfort[ed]." *See Kim*, 662 F.2d at 1064. In essence, Code 2013.9.B attempts to impose a civility code upon university students—students who are adults with full rights of participation in civic life, for whom the university does not stand *in loco parentis*, and who can never escape "the heavy hand of a regulation" that purports to apply wherever they speak. *Id.* As the Second Circuit has observed, even in elementary and secondary schools the administration's power to "teach students the boundaries of socially appropriate behavior" limits the punishment of "threatening" speech to instances that "occur[] publicly at school or a school-related event." *See Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011) (internal quotations and alterations omitted). A university's power to promote "socially appropriate behavior" among its students, who are adults expected to *shape* society, is surely even weaker. Thus, it is clear that Code 2013.9.B, if given a meaning in accord with its plain

language, rises to the level of an unreasonable infringement of the freedom of speech wholly unrelated to the university's interest in performing its educational mission. *See Sword*, 446 F.2d at 1096-97.

Of course, the fact that a university speech code arguably reaches substantial constitutionally protected speech is not dispositive as to whether the provision is unconstitutional. Rather, such restrictions are only unconstitutional if they are actually construed to reach substantial protected speech. And in this regard, the Fourth Circuit has made clear that a court "will not strike down a [regulation] as facially overbroad if its constitutionality can be preserved through a 'limiting construction'...capable of 'removing the seeming threat or deterrence to constitutionally protected expression.'" *Legend Night Club v. Miller*, 637 F.3d 291, 300 (4th Cir. 2011) (internal alterations omitted). Where, as here, the regulation is a state enactment, any "reasonable and readily apparent" limiting construction that follows from the "text or other source of...intent" "must be resorted to." *See id.* at 300-01. Such a limiting construction is readily apparent with respect to Code 2013.9.B. By the plain language of Code 2013.9.B, the communications proscribed are "[e]xamples" of behavior prohibited as a true threat, *i.e.*, speech "that by its very nature would be interpreted by a reasonable person to threaten or endanger the health, safety or well-being of another." *See* Code at 5-6; *White*, 670 F.3d at 507 (defining a true threat as communication that "an ordinary reasonable recipient who is familiar with the context...would interpret as a threat of injury"). Thus, it is fully appropriate here to construe Code 2013.9.B as prohibiting only true threats or fighting words,[27] both categories of speech that fall beyond the freedom of speech and both of which could be covered

---

[27] Fighting words, like true threats, are "those [words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *see also White*, 670 F.3d at 507 (comparing true threats to fighting words).

under the broad language of Code 2013.9.B. Plaintiff's March 2014 text message was neither; plaintiff did not threaten harm to another,[28] nor would his message "tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572.

Defendants appear to argue that quite apart from the fact that the March 2014 text message does not fall within the proper reach of Code 2013.9.B, it constitutes speech that GMU administrators could punish on an *ad hoc* basis because they could "reasonably conclude" that it would "'materially and substantially disrupt the work and discipline of the school.'" *Morse*, 551 U.S. at 403 (quoting *Tinker*, 393 U.S. at 513). In defendants' view, regardless whether the speech occurred on or off campus, the threat of committing suicide via firearm implicates GMU's interest in the order, safety, and well-being of its students. But that is not this case. Rather, the record here reflects that plaintiff was sanctioned for the March 2014 text message not because he posed harm to himself or to others, but because he intended to cause Roe distress. *See* Ericson Dep., 164:4-165:5. In this sense, defendants' invocation of *Tinker* and the grim shadow cast by school shootings amounts to nothing more than a *post hoc* justification for the action taken here with respect to the March 2014 text message. Simply put, *Tinker* does not justify the *ad hoc* imposition of punishment on an adult university student for speech that was privately communicated simply because the speaking party intended to cause distress and the receiving party might become distressed. *See Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 265 (3d Cir. 2002) (explaining that "disruption for purposes of *Tinker*" requires more than "discomfort and unpleasantness"). And where the state acts as sovereign rather than as educator,

---

[28] The authorities on which defendants rely to characterize plaintiff's speech as a true threat are distinguishable on the ground that these cases addressed threats of murder as well as suicide. *See generally Riehm v. Engelking*, 538 F.3d 952 (8th Cir. 2008); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001).

*i.e.*, where *Tinker* does not apply, the same result obtains, as it is well-settled that the state cannot penalize speech within the scope of the freedom of speech simply because the communicative impact is designed to cause certain harm.[29]

This is not to say that university administrators are powerless to act when a threat of suicide by firearm comes to their attention. On this issue, the Second Circuit's *Cox* decision is instructive. In *Cox*, a middle school administrator sequestered a student for several hours after the student submitted an essay containing a "casual description of illegal activity, violence, and suicide." 654 F.3d at 270. The purpose of this sequestration was to determine whether the student "posed an imminent threat to himself or others" and "whether he should be disciplined for his essay." *Id.* at 271. In the student's lawsuit for free speech retaliation, the Second Circuit did not reach or decide whether the essay was protected speech, instead concluding that the administrator's actions in separating the offending student from other students while determining whether a threat existed was not an adverse action. *See id.* at 273. *Cox* is instructive here for two points. First, *dicta* in *Cox* suggests that the power under *Tinker* to punish "threatening" speech that is private and divorced from school-related activities is circumscribed. *See id.* Second, *Cox* makes clear that school administrators have tools at their disposal to fulfill their obligation to ensure school safety that fall short of punishing empty threats of suicide. *See id.* at 274 ("[A] school administrator must be able to react to ambiguous student speech by temporarily removing

---

[29] *Cf., e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53 (1988) (in the intentional infliction of emotional distress context, rejecting the argument that where "the intent to cause injury is the gravamen" of the speech "the State's interest in preventing emotional harm simply outweighs whatever interest a speaker may have" and reiterating that "even when a speaker…is motivated by hatred or ill will his expression [is] protected"); *NAACP v. Claiborne Hardware*, 458 U.S. 886, 928 (1982) (in the interference with business relations context, "emotionally charged rhetoric…[that] do[es] not incite lawless action…must be regarded as protected speech"); *Cohen v. California*, 403 U.S. 15, 26 (1971) (rejecting the view that the Constitution permits states to punish speech because of its "emotive function").

the student from potential danger (to himself and others) until it can be determined whether the speech represents a real threat to school safety and student learning."). And as the Fourth Circuit has expressed, a university should not "silenc[e] speech" where it can "accomplish[] its goals in some [other] fashion." *IOTA XI Chapter of Sigma Chi Fraternity*, 993 F.2d at 393.

In short, *Cox* is illustrative of the tools universities have at their disposal, consistent with *Tinker*, to address communications dealing with potential suicides. Plaintiff's text message, once brought to GMU's attention, justified intervention by GMU administrators to investigate whether a threat was real and to separate plaintiff from other students until a determination was made. Thus, consistent with the Fourteenth Amendment, public university administrators may intervene as necessary to protect their students and officials, and in appropriate situations punishment may follow. Yet, what a public university administrator may not do, as occurred here, is punish the speaker simply because he intended to cause distress and the recipient found the message distressing or may have found it distressing.[30]

In sum, defendants' imposition of a sanction on plaintiff for the March 2014 text message was improper; the text message was not a true threat, fighting words, or communication properly proscribed consistent with *Tinker*. On this record, plaintiff was punished for the text message because of its intended emotive effect on the recipient. That was in error. Accordingly, plaintiff's

---

[30] Indeed, imagine if a university student with actual suicidal tendencies reached out to a friend, classmate, or residence hall advisor about his suicidal thoughts, thereby placing that person in distress. Defendants' theory places such students in an unconscionable bind: keep their mental health problems to themselves and possibly forgo help or risk expulsion for having caused distress to another. If university officials are truly concerned about the possibility of school shootings, as defendants here no doubt are, a regime that exposes students to punishment for expressing suicidal thoughts might be entirely counterproductive to the goal of identifying students who pose a potential threat to themselves or others.

motion for summary judgment on Count IV must be granted and defendants' motion for summary judgment on Count IV must be denied.

### III.

When plaintiff initiated this lawsuit, he asserted a claim for a violation of his substantive due process rights, alleging that "Ericson 'disregarded' the BDSM context of the relationship and how it 'affected matters like consent and related issues' and treated a BDSM relationship as '*per se* sexual misconduct.'" *Doe*, --- F. Supp. 3d ---, 2015 WL 5553855, at *10. This, plaintiff argued, constituted a violation of plaintiff's right to sexual liberty as protected under *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), which held that a state could not criminalize intimate sexual conduct between consenting adults.[31] Defendants' motion to dismiss this claim was granted because plaintiff's allegations were construed as complaints about executive action, which are governed by a "shocks the conscience" analysis. *See Doe*, --- F. Supp. 3d ---, 2015 WL 5553855, at *11 (citing, *inter alia*, *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (holding that "the cognizable level of executive abuse of power [is] that which shocks the conscience")). Because defendants' actions, as alleged, did not "shock the conscience," plaintiff failed to state a claim for an infringement of substantive due process.

Plaintiff moved to reconsider the dismissal of his substantive due process claim, arguing that GMU's Code of Conduct is a legislative enactment that treats BDSM relationships as sexual misconduct *per se*. Thus, plaintiff argued that the appropriate analytical framework was the strict scrutiny analysis employed where a legislative enactment infringes on a constitutionally

---

[31] This characterization of *Lawrence* articulates both the breadth and limitations of its holding. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2598-99 (2015) (citing *Lawrence* as an "instructive precedent" for the "principle of broad[] reach" that there are "constitutional liberties in [the] intimate bond" of marriage); *Lawrence*, 539 U.S. at 578 (noting that the decision does not invalidate laws against "public conduct or prostitution").

protected fundamental liberty interest. *See, e.g., Kerry v. Din*, 135 S. Ct. 2128, 2133 (2015) (plurality opinion) (noting that the Due Process Clause of the Fourteenth Amendment protects certain "fundamental" liberty interests to the extent that these liberties can be limited only through a regulation that is narrowly tailored to serve a compelling state interest). Although plaintiff's motion to reconsider was disposed on other grounds, it is appropriate here to present an additional rationale as to why the Due Process Clause of the Fourteenth Amendment does not prohibit the regulation of BDSM conduct.

The Supreme Court's cases recognizing judicially-enforceable fundamental liberty interests disclose two equal but distinct lines of precedent with respect to the appropriate methodology to be used when considering whether a liberty is fundamental and therefore protected as judicially enforceable under the Fourteenth Amendment. One approach is a common law methodology articulated by Justice Harlan in dissent in *Poe v. Ullman*, 367 U.S. 497, 543 (1961), and later embraced in cases such as *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 848-49 (1992), and *Obergefell*, 135 S. Ct. at 2598-99. This methodology balances private interests against social needs by reference to, but not bound by, historical practice. In contrast, a more restrictive and historical-focused approach was articulated in *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997), in which the Supreme Court held that a judicially enforceable implied fundamental liberty interest must be (i) deeply rooted in the nation's history and traditions and (ii) implicit in the concept of ordered liberty.

Under the *Glucksberg* mode of analysis, plaintiff's asserted fundamental liberty interest in engaging in BDSM sexual activity is clearly not protected as judicially enforceable under the Fourteenth Amendment.[32] Defined with specificity and cast as a negative liberty, as *Glucksberg*

---

counsels, plaintiff's asserted liberty is a freedom from state regulation of consensual BDSM sexual activity. There is no basis to conclude that tying up a willing submissive sex partner and subjecting him or her to whipping, choking, or other forms of domination is deeply rooted in the nation's history and traditions or implicit in the concept of ordered liberty.

Perhaps in recognition of the futility of his argument under *Glucksberg*, plaintiff bases his fundamental liberty interest argument on *Lawrence*, a case in the Justice Harlan common law tradition. In order to understand fully the methodology employed under this line of cases, analysis properly begins by considering the most recent of the Supreme Court's decisions in this line, namely *Obergefell*. Importantly, *Obergefell* explicitly establishes that the Due Process and Equal Protection Clauses are "interlocking" and each "leads to a stronger understanding of the other." *See* 135 S. Ct. at 2603-04. In other words, *Obergefell* highlights that the decision to recognize an implied fundamental liberty interest as judicially enforceable turns, in part, on whether the liberty interest at issue has historically been denied on the basis of impermissible animus or, alternatively, on a legitimate basis aimed at protecting a vulnerable group. *See, e.g., id.* at 2596.[33] *Lawrence* is not to the contrary. There, the Supreme Court reasoned that a statute

---

[32] For purposes of substantive due process analysis, the pertinent question is whether a liberty is judicially enforceable rather than whether it exists in the abstract. Indeed, the Ninth Amendment confirms the possibility that liberty interests not clearly articulated in the Constitution exist. *See* U.S. Const. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."). Yet, as the late Justice Scalia once persuasively explained, "the Constitution's refusal to 'deny or disparage' other rights is far removed from affirming any one of them, and even further removed from authorizing judges to identify what they might be, and to enforce the judges' list against laws duly enacted by the people." *Troxel v. Granville*, 530 U.S. 57, 91 (2000) (Scalia, J., dissenting). In this respect, "the commitment to representative democracy set forth in the founding documents" confirms that the appropriate venues in which to argue "that the State has *no power* to interfere with" certain liberties are "legislative chambers or…electoral campaigns." *Id.* at 91-92 (Scalia, J., dissenting).

[33] *Obergefell*'s discussion of the interlocking nature of liberty and equality explains—or is at least consistent with—the Supreme Court's willingness to recognize constitutionally protected

criminalizing homosexual sodomy violated a judicially enforceable implied fundamental liberty interest in sexual intimacy because of the history of animus towards homosexuals. *See Lawrence*, 539 U.S. at 571 (noting that "powerful voices…condemn homosexual conduct as immoral" but that this does not permit "the majority [to] use the power of the State to enforce these views on the whole society through the operation of the criminal law"). Indeed, the Supreme Court has since noted that *Lawrence* "acknowledged, and sought to remedy, the continuing inequality that resulted from laws making intimacy in the lives of gays and lesbians a crime against the State" and "therefore drew upon principles of liberty and equality to define and protect the rights of gays and lesbians." *Obergefell*, 135 S. Ct. at 2604.

Under the *Lawrence* methodology, history and tradition continue to inform the analysis. *See id.* at 2598 ("History and tradition guide and discipline [the implied fundamental liberty interests] inquiry but do not set its outer boundaries."). Yet, courts must consider not only the history and tradition of freedom to engage in certain conduct, but also any history and tradition of impermissible animus that motivates the legislative restriction on the freedom in order to weigh with appropriate rigor whether the government's interest in limiting some liberty is a justifiable use of state power or an arbitrary abuse of that power. In this respect, the conclusion reached here under the *Glucksberg* line of reasoning that there is no deeply rooted history or

---

and judicially enforceable implied fundamental liberty interests when the person asserting the right has been denied a liberty based on moral or moral condemnation, but not when the denial is rooted in a desire to protect the vulnerable. *See, e.g., Glucksberg*, 521 U.S. at 731 (declining to enforce a fundamental liberty interest in obtaining physician-assisted suicide in part due to the vulnerability of certain patients); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 281 (1990) (similar). Thus, the Supreme Court has made it plain that the government can restrict certain freedoms as necessary to *protect* or otherwise to further permissible interests. *See id.; also, e.g., Casey*, 505 U.S. at 874-75 (plurality opinion) (employing an "undue burden" test in the context of the fundamental liberty interest in procuring an abortion because "the State's interest in the potential life within the woman" justifies certain regulations).

tradition of BDSM sexual activity remains relevant and important to the analysis. Also relevant and important to the analysis is the *absence* of a history of impermissible animus as the basis for the restriction at issue here. Sexual activity that involves binding and gagging or the use of physical force such as spanking or choking poses certain inherent risks to personal safety not present in more traditional types of sexual activity. Thus, as in *Cruzan* and *Glucksberg*, a legislative restriction on BDSM activity is justifiable by reference to the state's interest in the protection of vulnerable persons, *i.e.*, sexual partners placed in situations with an elevated risk of physical harm. Accordingly, consistent with the logic of *Lawrence*, plaintiff has no constitutionally protected and judicially enforceable fundamental liberty interest under the Due Process Clause of the Fourteenth Amendment to engage in BDSM sexual activity.

### IV.

For the foregoing reasons, plaintiff's motion for summary judgment must be granted and defendants' motion for summary judgment must be denied. Because the parties must address the issue of a proper remedy before a final order can issue, it is appropriate to set a schedule for the briefing of the remedy issue.

An appropriate order will issue.

Alexandria, Virginia
February 25, 2016

T. S. Ellis, III
United States District Judge