**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **JOHN DOE,** ) | |
|     **Plaintiff,** ) | |
| ) | |
|     **v.** ) | **Case No. 1:15-cv-209** |
| ) | |
| **THE RECTOR AND VISITORS OF** ) | |
| **GEORGE MASON UNIVERSITY,** *et al.,* ) | |
|     **Defendants.** ) | |

## MEMORANDUM OPINION

Plaintiff was expelled from George Mason University ("GMU") following a constitutionally inadequate disciplinary process that found him responsible for sexual misconduct and sending electronic communications likely to cause distress. He sued and prevailed; the flaws in GMU's disciplinary process amounted to a deprivation of liberty without due process of law, and the speech for which he was found liable was constitutionally protected.[1]

Two issues remain pending, namely (i) the issuance of an appropriate remedy and (ii) defendants' objections to the magistrate judge's February 23, 2015 Order granting plaintiff leave to proceed pseudonymously. Both issues have been fully briefed and argued and are now ripe for disposition.

## I.

A complete recitation of the facts and proceedings to date is included in the Memorandum Opinion resolving the merits ("Merits Opinion").[2] It suffices here to recite

---

[1] *See Doe v. Rector & Visitors of George Mason Univ., et al.,* No. 15-cv-209, --- F. Supp. 3d ---, 2016 WL 775776 (E.D. Va. Feb. 25, 2016) (Memorandum Opinion) (Doc. 92); *Doe v. Rector & Visitors of George Mason Univ., et al.,* No. 15-cv-209 (E.D. Va. Feb. 25, 2016) (Order) (Doc. 93).

succinctly the facts pertinent to the parties' disputes regarding an appropriate remedy and whether to continue to proceed pseudonymously.

Plaintiff filed this lawsuit in February 2015 following his December 2014 expulsion from GMU on misconduct charges. Plaintiff alleged that shortly after his matriculation at GMU, he entered into a consensual BDSM relationship[3] with Jane Roe, a student at another university. An important rule of the relationship involved the use of a safe word—"red"—which was what plaintiff and Roe agreed that Roe would say to signal that she wanted sexual activity to cease. In other words, as agreed between plaintiff and Roe, "no" did *not* mean "no" in the course of their BDSM activity, only "red" meant "no." This rule proved consequential; on October 27, 2013, during their relationship, plaintiff continued sexual activity with Roe despite her equivocation as to whether she consented and despite the fact that she tried to push plaintiff away.[4] Because Roe never said "red," plaintiff thought she was consenting within the terms of their relationship.

A few months after the October 27 incident, plaintiff and Roe ended their approximately one-year relationship. Plaintiff occasionally attempted to reconnect with Roe, including one incident in March 2014 in which plaintiff sent Roe a text message indicating that he would shoot himself if Roe did not speak with him. Eventually, Roe decided to report plaintiff's behavior to the GMU police department, which, in turn, put Roe in contact with Brent Ericson, GMU's Director of the Office of Student Conduct. After months of interaction with Ericson, Roe decided to pursue charges against plaintiff through GMU's disciplinary process.

---

[2] *See Doe*, --- F. Supp. 3d ---, 2016 WL 775776, at *1-5.

[3] BDSM is shorthand for a relationship involving bondage, discipline, dominance, submission, sadism, and masochism. As these words suggest, BDSM sexual activity might involve such actions as biting, choking, spanking, or the use of restraints.

[4] Hereinafter, the events of October 27, 2013, as described, are referred to as "the October 27 incident."

Ericson initiated the disciplinary process by informing plaintiff in August 2014 that charges had been made against him. Importantly, every communication plaintiff received from GMU suggested that the disciplinary charges concerned the October 27 incident. In September 2014, a three-member panel of GMU faculty and staff members convened to hear the allegations against plaintiff. Importantly, by all indications the hearing panel, like plaintiff, believed that with respect to Roe's sexual misconduct allegations only the October 27 incident was in issue. Over the course of the ten-hour hearing that focused chiefly on the October 27 incident, a hearing plaintiff admits satisfied the requirements of due process, both plaintiff and Roe gave their sides of the story, which included plaintiff's explanation of the BDSM dynamic of his relationship with Roe. Ultimately, the panel found plaintiff not responsible (*i.e.*, not guilty) of any violations of the student conduct code.[5]

Roe appealed the hearing panel's decision. Notwithstanding Roe's failure to state an acceptable ground for an appeal under GMU's disciplinary procedures,[6] Ericson allowed the appeal to proceed, assigned it to himself, met *ex parte* and off-the-record with Roe, and firmly resolved to find plaintiff responsible for sexual misconduct before even giving plaintiff a chance to defend himself. In October 2014, Ericson overturned the hearing panel's decision and imposed

---

[5] Plaintiff had been charged with four violations of GMU's Code of Conduct: (i) Infliction of physical harm to any person(s), including self (Code 2013.7.A); (ii) Deliberate touching or penetration of another person without consent (Code 2013.8.A); (iii) Conduct of a sexual nature (Code 2013.8.C); and (iv) Communication that may cause injury, distress, or emotional or physical discomfort (Code 2013.9.B).

[6] Under GMU procedures, both the accused and the complainant can pursue an appeal based on any of three grounds: (i) Information not available at the hearing that, had it been available, would in all reasonable likelihood have produced a different finding; (ii) Substantial procedural irregularity with respect to applicable procedures as determined by a conduct officer; and/or (iii) Perceived hearing officer bias based on factors other than the hearing officer's decision and rationale for such decision.

a sanction of expulsion. Thereafter, plaintiff filed his own appeal to Juliet Blank-Godlove, GMU's Dean of Students. Blank-Godlove, like Ericson, met *ex parte* and off-the-record with Roe while considering the appeal, and she reviewed only those parts of the record that supported Ericson's decision. In December 2014, Blank-Godlove affirmed Ericson's decision and expelled plaintiff from GMU.

As recorded in the Merits Opinion, defendants violated plaintiff's right to due process (i) by failing to provide adequate notice of the full scope of the factual allegations in issue in the disciplinary proceeding, (ii) by permitting Roe, without a proper basis in GMU's internal disciplinary procedures, to appeal the finding of no responsibility, and (iii) by depriving plaintiff of an opportunity to mount an effective defense, including by prejudging his case and by holding off-the-record and *ex parte* meetings with Roe. *See Doe*, --- F. Supp. 3d ---, 2016 WL 775776, at *12. Moreover, as the Merits Opinion reflects, defendants infringed on plaintiff's freedom of speech by penalizing him for his March 2014 text message to Roe in which plaintiff threatened suicide. *See id.* at *14-19.

Following the issuance of the Merits Opinion, the parties were directed to file briefs addressing the question of a proper remedy. The parties complied, and the issue now has been fully briefed and argued.

## II.

Analysis of the remedy issue properly begins with a recitation of the principles that guide the issuance of an equitable remedy following a merits adjudication. Plaintiff seeks an injunction, which is an equitable remedy, the goal of which is "to do justice" on the specific facts at hand. *See Bowen v. Hockley*, 71 F.2d 781, 786 (4th Cir. 1934). Importantly, an injunction may not be used for "punishment or reparations for...past violations." *Belk v. Charlotte-Mecklenburg*

*Bd. of Edu.*, 269 F.3d 305, 347 (4th Cir. 2001) (*en banc*). Moreover, an injunction is an extraordinary remedy that requires plaintiff to demonstrate (i) that he has suffered an irreparable injury, (ii) that damages are unavailable or inadequate to compensate him for that injury, (iii) that an injunction is warranted based on the balance of hardships between the plaintiff and defendants, and (iv) that the public interest will not be disserved by an injunction. *See A Helping Hand, LLC v. Baltimore Cnty.*, 355 F. App'x 773, 775-76 (4th Cir. 2009) (quoting *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).[7]

At the outset, there can be no doubt that plaintiff has suffered an irreparable injury and that he has no adequate remedy at law. As to the former, defendants' unconstitutional conduct deprived plaintiff of three semesters of education at GMU, thereby delaying plaintiff's graduation from that institution. The clock cannot be turned back to December 2014 to allow plaintiff to resume his course of study on his preferred schedule. Instead, plaintiff will complete his education at GMU, if at all, several months or years behind the majority of his peers with whom he matriculated. And with regard to damages, no such remedy exists in light of the ruling that defendants are entitled to qualified immunity. *See Doe v. Rector & Visitors of George Mason Univ.*, No. 15-cv-209, --- F. Supp. 3d ---, 2015 WL 5553855, at *8-10, *14 (granting defendants qualified immunity from individual damages liability because the rights asserted were not "beyond debate" at the time of the alleged violations). Thus, the analysis here focuses chiefly on (i) whether the balance of hardships between the parties justifies an injunctive remedy and, if

---

[7] Although this four-factor test is most familiar in the preliminary injunction context, the Supreme Court in *eBay* stated that these "well-established principles of equity" apply where "a plaintiff seek[s] a permanent injunction." 547 U.S. at 391. The Fourth Circuit has since applied the *eBay* standard in reviewing injunctive relief where, as here, the plaintiff prevailed in a civil rights action. *See A Helping Hand, LLC*, 355 F. App'x at 775-76.

so, (ii) fashioning an injunction that is fair and just, that is not punitive, and that does not disserve the public interest.

It is appropriate to begin with the matters on which the parties agree. As the Merits Opinion made clear, "there can be no doubt that it is appropriate here to vacate the decisions of defendants Blank-Godlove and Ericson and to order that plaintiff be reinstated as a GMU student," presumably in good standing,[8] with any reference to his December 2014 expulsion on misconduct grounds expunged from his educational records. *Doe*, --- F. Supp. 3d ---, 2016 WL 775776, at \*13. The reason for this is straightforward and not contested by GMU. Simply put, the burden imposed on defendants in this regard is slight, and given the nature of the charges it is important to order a remedy that removes any stain on plaintiff's reputation and allows plaintiff to complete his education at GMU, if he chooses. Nor can reinstatement and expungement be said to disserve the public interest; to the contrary, leaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest. A sanction resulting from a constitutional error warrants a remedy, and such a sanction serves no public purpose, such that its removal will have no adverse impacts on third parties. In this respect, it is important to reiterate that GMU does not contest that reinstatement and expungement are proper remedies in light of the constitutional violation plaintiff suffered.[9] Additionally, the parties appropriately agree that Ericson and Blank-Godlove should not be involved in the event of any further

---

[8] If plaintiff was not in good standing at the time of his expulsion for reasons unrelated to Roe's accusations, *e.g.*, any prior disciplinary violations, then it is appropriate for GMU to reinstate plaintiff with whatever status he held prior to the constitutional violation.

[9] *See* Transcript of Motions Hearing ("Tr.") at 24:12-15 (Friday, April 1, 2016) ("[W]e agree that a reinstatement...and an expungement of that record would be appropriate.").

disciplinary proceedings against plaintiff at GMU based on any accusations by Roe.[10] Indeed, GMU appears prepared to use external parties, rather than anyone within the university system, to adjudicate any further disciplinary charges against plaintiff. *See* Tr. 25:11-16.

Although the parties agree about reinstatement, expungement, and the disqualification or recusal of Ericson and Blank-Godlove, the parties' positions on further aspects of the remedy sharply diverge. Specifically, the key questions presented in crafting the remainder of the remedy are, as noted in the Merits Opinion,

> (i) whether GMU should be allowed to pursue a new round of disciplinary hearings [against plaintiff and based on Roe's accusations], (ii) if so, what allegations occurring before the date of judgment should be open for adjudication, and (iii) whether there should be any restrictions on the means by which the new disciplinary hearings, if any, are to be carried out.

*Doe*, --- F. Supp. 3d ---, 2016 WL 775776, at *13.

The first issue is whether GMU should be allowed to pursue a new round of disciplinary hearings on Roe's accusations against plaintiff concerning the October 27 incident and the text message that formed the basis of plaintiff's expulsion.[11] Although the typical remedy for a violation of due process in the university disciplinary context is more process,[12] the facts of this case are not typical of cases in which a student is expelled without due process. Specifically,

----

[10] *See* Tr. at 24:17-21 ("Mr. Ericson and Ms. Blank-Godlove...do not want to be involved in any future adjudications...related to Mr. Doe").

[11] As the Merits Opinion makes clear, the text message in issue is not within the permissible scope of GMU's student speech code. *See Doe*, --- F. Supp. 3d ---, 2016 WL 775776, at *14-18. Because GMU may not, consistent with the Constitution, proceed to punish this speech for its emotive content—as the record reflects occurred—it is appropriate to enjoin any further attempt to do so.

[12] *See, e.g., Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 261 (E.D. Pa. 2012) (ordering reinstatement unless the wrongfully expelled student is afforded a new hearing that comports with due process).

plaintiff received due process in his initial hearing with respect to the October 27 incident, about which he was on notice. The constitutional violation occurred only once the appeal was set into motion. *See id.* at *12 (faulting GMU for "deviat[ing] from its own procedures in permitting an appeal of a finding of no responsibility"). In this respect, permitting a new panel hearing on the October 27 incident would not be an adequate remedy; instead, it would unfairly prejudice plaintiff, who already won his case concerning the October 27 incident.

Nor would a new appeal of the initial panel's findings in favor of plaintiff remedy the injury plaintiff sustained, as (i) the granting of the appeal was contrary to GMU procedures in the first instance and (ii) under GMU procedures the time to initiate a new appeal of the September 2014 panel's decision has long since passed. *See* P. Mem. Supp. (Doc. 72), Ex. 11 at 17 (appeals must ordinarily be submitted within five business days of the date of a decision, except appeals based on new evidence may be brought within thirty days). Put simply, the accusations stemming from the October 27 incident have been fully and fairly resolved in plaintiff's favor. In fact, defendants violated plaintiff's right to due process by wrongfully depriving him of that victory through a constitutionally defective appeal process. Thus, plaintiff is entitled to have his victory restored. As with plaintiff's reinstatement, it simply cannot be said that restoring plaintiff to his rightful position unduly burdens defendants or disserves the public interest.

The more difficult question arises because plaintiff seeks more than just his reinstatement, expungement of the expulsion from his record, and to have the October 27 incident put behind him; additionally, plaintiff seeks to bar GMU from pursuing *any* further disciplinary action against him based on any allegations by Roe that could have been adjudicated initially. GMU opposes such relief. This is a difficult question because there are substantial, plausible arguments on both sides of the issue.

8

In plaintiff's view, if GMU is allowed to initiate further disciplinary proceedings based on new Roe allegations immediately upon plaintiff's reinstatement, then for plaintiff this lawsuit would seem less a victory than a long, arduous journey for a short drink of bitter water. Thus, plaintiff raises three arguments, each based on principles of fairness, to support his position that GMU should be barred from bringing further disciplinary proceedings against plaintiff based on allegations by Roe that could have been brought initially. First, plaintiff argues that the entire GMU Office of Student Conduct must be disqualified as biased. Without the Office of Student Conduct, GMU would need to turn to an adjudicator lacking the Office of Student Conduct's training on sexual misconduct matters. This lack of training, plaintiff argues, would prejudice him. Next, plaintiff raises an argument akin to *res judicata*, arguing that because GMU exercised substantial control over the charges brought against plaintiff, it is fair to preclude GMU from bringing new charges that could have been brought in the first instance. To do otherwise, plaintiff suggests, would create a perverse incentive for universities to hold back related charges with the aim of securing a second bite at the disciplinary apple in case it is needed. Finally, plaintiff argues that the lengthy delay between now and the time Roe alleges that any sexual misconduct occurred will also unfairly prejudice plaintiff's ability to mount an effective defense.

GMU, in turn, raises its own substantial argument in support of excluding from the remedial injunction any prohibition on further disciplinary hearings for Roe's allegations other than those already decided by the initial hearing panel. As GMU points out, under Title IX[13] GMU has an obligation to pursue allegations of sexual misconduct. And the record here suggests that Roe may have additional allegations of sexual misconduct by plaintiff that she may wish to pursue. Importantly, GMU's obligations under Title IX arise from a legislative and

---

[13] 20 U.S.C. § 1681 *et seq.*

administrative judgment by politically accountable entities that sexual misconduct allegations on university campuses must be taken very seriously. That judgment cannot lightly be undermined.

Plaintiff's initial argument—that the entire Office of Student Conduct must recuse itself from involvement in disciplinary proceedings against plaintiff based on allegations by Roe—is unpersuasive and without support in the record. There is simply no indication that anyone in the Office of Student Conduct other than Ericson and Blank-Godlove treated plaintiff unfairly. With Ericson and Blank-Godlove removed from the picture, as GMU agrees is appropriate, there is no reason to doubt that other members of the Office of Student Conduct can provide a fair hearing for plaintiff, if necessary. *Cf. Boston v. Webb*, 783 F.2d 1163, 1166 (4th Cir. 1986) (noting the well-settled presumption of regularity by government officials). And if GMU elects to use third-party adjudicators, there is again no serious threat to plaintiff; due process does not entitle plaintiff to a sexual misconduct subject-matter expert as an adjudicator.

Second, plaintiff's *res judicata* argument has substantial force, but is ultimately unpersuasive. To be clear, plaintiff does not suggest that *res judicata* formally applies;[14] his argument is that the same fairness and finality concerns that underlie the doctrine of *res judicata* are present here.[15] Although this is true, there are important differences between the typical civil

---

[14] No authority has been cited or found that supports the application of *res judicata* in the context of academic disciplinary hearings. Rather, plaintiff compares this case to *Ashe v. Swenson*, 397 U.S. 436 (1970), in which the Supreme Court held that the government could not prosecute a defendant in piecemeal fashion for robbery of a six-person poker game (i) by charging the defendant for robbing one player, (ii) waiting to see the outcome of the trial, and (iii) then charging the defendant for robbing another of the players after an initial verdict of not guilty. The instant case is nothing like *Ashe*; each alleged incident of sexual misconduct is a discrete situation with its own facts and circumstances, and a finding that plaintiff did not commit sexual misconduct during the October 27 incident does not foreclose the possibility that he committed sexual misconduct on another occasion.

litigation situation in which *res judicata* applies and university civil disciplinary proceedings that suggest that it might be unfair to apply principles of *res judicata* in this context. For example, the alleged victim here—Roe—may have little or no control over the precise charges the university will pursue or how the charges will be framed. In other words, because the allegedly injured party does not control the proceedings, it is unfair to deprive the alleged victim of a possible remedy based on the university's failure to pursue all possible claims. Indeed, plaintiff's argument, in effect, is that because defendants violated the Fourteenth Amendment, GMU must now be enjoined from enforcing Title IX with respect to Roe's further allegations against plaintiff. An injunctive order that enjoins GMU from enforcing Title IX with respect to these further allegations would disserve Roe's interests and the public interest by potentially leaving credible sexual misconduct allegations without redress.[16]

Plaintiff's related argument in support of precluding GMU from pursuing further disciplinary charges against plaintiff stemming from Roe's additional allegations is based on the need to deter GMU from piecemeal adjudication of sexual misconduct claims. This argument is also not compelling. To be sure, sound policy reasons exist to prefer a regime in which universities do not hold back related sexual misconduct charges as a "Plan B" in case the initial charge or charges do not succeed. The alternative is that an accused could be subject to a Chinese water torture of successive proceedings. Although this is a valid consideration, it is not for the

---

[15] In this respect, it may well make sense for universities to adopt, as a matter of their own internal policies, a form of internal administrative *res judicata*.

[16] Of course, Roe's redress for the alleged sexual misconduct is not limited to Title IX, as state criminal and civil remedies have been available to Roe from the outset. Thus, foreclosing further disciplinary action by GMU based on Roe's allegations would not leave her without any form of redress. Yet, the availability of these remedies does not affect the force and applicability of Title IX, a remedy Congress has deemed appropriate to make available despite knowing full well that state civil and criminal remedies exist.

federal courts to micromanage how universities process their disciplinary dockets other than by enforcing that which the law clearly requires. Accordingly, where, as here, a public university violates the requirements of due process, the intervention of the federal courts is clearly warranted if the injured party files suit. But to step beyond restoring an aggrieved plaintiff to the *status quo ante* and to fashion a remedy with an eye towards deterring certain conduct by universities treads close to the imposition of a punitive measure, which is an impermissible basis for a remedy in equity. *See Belk*, 269 F.3d at 347.

Plaintiff's final argument—that he will suffer unfair prejudice by the delay in bringing further charges relating to Roe's allegations—is far from insubstantial. Memories fade over time and witnesses may become unavailable or difficult to locate. Nonetheless, in light of the broader public considerations already noted, this argument does not justify completely enjoining new disciplinary action against plaintiff based on Roe's allegations other than those already fairly adjudicated. At the same time, the prejudice to plaintiff in mounting an effective defense cannot be ignored. The goal of a remedy must be to restore plaintiff, as best as possible, to the *status quo ante*. Before the constitutionally inadequate appeal, the *status quo* was that GMU could pursue additional disciplinary charges against plaintiff based on Roe's additional allegations, if any, and plaintiff and Roe would have fresh recollections of the events and ready access to possible witnesses. Although the effects of time cannot be undone, they can be minimized. In that regard, imposing a time limit in which to pursue the remainder of Roe's allegations against plaintiff, if any, serves to ensure that if GMU initiates new disciplinary charges against plaintiff, plaintiff will be as close to the *status quo ante* in terms of memory and witness access as possible.

In determining an appropriate time limit, three facts bear mention. First, the record reflects that it took fewer than thirty days from the date plaintiff was initially notified of the charges against him for a hearing panel to decide his case. Second, and similarly, it took fewer than thirty days from the date of the panel decision for Ericson to decide Roe's appeal. Third, many of the students with whom plaintiff matriculated—the persons most likely to be relevant peer witnesses—are not set to graduate until mid-May of this year. Because GMU has demonstrated an ability to pursue sexual misconduct claims to completion in under sixty days from the date of notice, it is appropriate here to require that any new disciplinary charges against plaintiff based on sexual misconduct allegations by Roe that could have been brought at plaintiff's initial sexual misconduct hearing be resolved—including any appeals—in a manner comporting with due process within sixty days of final judgment. In other words, sixty days after the entry of final judgment in this case, defendants will be permanently enjoined from pursuing disciplinary charges against plaintiff for any allegations of sexual misconduct by Roe relating to any event occurring before August 19, 2014, when plaintiff was first notified of Roe's sexual misconduct charges against him. This sixty-day timeframe seeks, as best as feasible, to preserve relevant memories and access to any relevant peer witnesses.

In short, it is inappropriate here to foreclose GMU from pursuing any new disciplinary charges against plaintiff based on Roe's allegations concerning events other than those underlying plaintiff's December 2014 expulsion. Yet, if such charges materialize, it is appropriate to require GMU to move with alacrity to prevent further prejudice to plaintiff's ability to defend himself, specifically by requiring that such charges be fully and fairly resolved within sixty days of the entry of final judgment in this case. And, as noted *supra*, Ericson and

13

Blank-Godlove should have no personal involvement in the investigation, preparation, or adjudication of any such charges.

### III.

Finally, analysis turns to the question whether plaintiff's use in this case of pseudonyms for himself and Roe should be allowed to continue. Plaintiff filed contemporaneously with the filing of his Complaint a motion for leave to proceed under a pseudonym, which the magistrate judge granted before defendants were heard on the matter.[17] Thereafter, defendants filed a timely objection to the use of pseudonyms for plaintiff and Roe.[18] After briefing and argument, the objection was taken under advisement pending the development of a full record that would permit the balancing of the interests necessary to the analysis.

To allow a party to proceed under a pseudonym is a rare dispensation, as pseudonymous litigation "undermines the public's right of access to judicial proceedings." *Doe v. Public Citizen*, 749 F.3d 246, 273 (4th Cir. 2014). Indeed, the right of public access to judicial proceedings has deep constitutional and common law roots. *See id.* at 268. The use of a pseudonym is, in effect, a partial sealing of a lawsuit that removes from public access certain aspects of the judicial proceeding. As such, "a district court has an independent obligation to ensure that extraordinary circumstances support a request [to litigate under a pseudonym] by

---

[17] *See Doe v. Rector & Visitors of George Mason Univ., et al.*, No. 15-cv-209 (E.D. Va. Feb. 23, 2015) (Order) (Doc. 6).

[18] It is puzzling that GMU opposed plaintiff's request to use pseudonyms because GMU invariably treats sexual misconduct accusations as confidential when pursued internally. Indeed, GMU's opposition, which included opposition to allowing Roe to proceed under a pseudonym, could have the effect of chilling the reporting of sexual misconduct. Specifically, GMU's position on the use of pseudonyms here leaves accusers with no guarantee that their privacy will not be stripped away if the accused proceeds to litigation following an adverse sexual misconduct adjudication. Without a guarantee of privacy, some sexual misconduct victims may not report at all.

balancing the party's stated interest in anonymity against the public's interest in openness and
prejudice that anonymity would pose to the opposing party." *Id.* at 274.

In making the determination whether a party should be allowed to litigate under a
pseudonym, courts in the Fourth Circuit are guided by at least five factors:

> Whether the justification asserted by the requesting party is merely to avoid the
> annoyance and criticism that may attend any litigation or is to preserve privacy in
> a matter of sensitive and highly personal nature; whether identification poses a
> risk of retaliatory physical or mental harm to the requesting party or even more
> critically, to innocent nonparties; the ages of the person whose privacy interests
> are sought to be protected; whether the action is against a governmental or private
> party; and, relatedly, the risk of unfairness to the opposing party from allowing an
> action against it to proceed anonymously.

*James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). These factors, applied here, point
persuasively to the conclusion that plaintiff's request to proceed under a pseudonym is
appropriate for now.

There can be no doubt that the litigation here focuses on "a matter of sensitive and highly
personal nature." *Id.* at 238. Plaintiff has been accused of sexual misconduct, the mere accusation
of which, if disclosed, can invite harassment and ridicule. *Cf. Doe*, --- F. Supp. 3d ---, 2016 WL
775776, at *12 ("[C]ommon sense suffices to understand that an adjudication of responsibility
for sexual misconduct carries a much more powerful stigma than an adjudication of run-of-the-
mill assault or vandalism."). Moreover, it is possible that plaintiff could be targeted for
"retaliatory physical or mental harm" based on the accusations alone. *James*, 6 F.3d at 238. This
threat is all the more serious given that this case has drawn significant media attention, which
means many people across the country are aware of Roe's accusations against plaintiff.[19] Indeed,

_____

[19] *E.g.*, Eugene Volokh, "Court: George Mason University violated due process when expelling
student for alleged BDSM-related sex assault," Washington Post: The Volokh Conspiracy (Mar.
4, 2016), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/03/04/court-

some responses to the media's reporting on this case have been vitriolic, which is not particularly surprising given the highly-charged nature of the accusations. Moreover, it bears reiteration that the fact that accusations of this sort inspire passionate responses and have severe ramifications is reflected in the anonymity afforded to the accusers and the accused when participating in GMU's disciplinary proceedings. It makes little sense to lift the veil of pseudonymity that—for good reason—would otherwise cover these proceedings simply because *the university* erred and left the accused with no redress other than a resort to federal litigation. In fact, to do so may well discourage aggrieved students from seeking recourse when they fall victim to defective university disciplinary procedures or may discourage victims from reporting sexual misconduct in the first instance.

To be clear, any fear that plaintiff's BDSM lifestyle choice would open him to criticism or embarrassment would not be sufficient to justify the use of a pseudonym. Indeed, most litigation entails embarrassment of some form for one or both parties. Although a voluntary BDSM relationship may reasonably be characterized as "highly personal," *id.*, it is distinguishable from other highly personal matters, *e.g.*, hereditary health issues, in that a voluntary BDSM sexual relationship is a choice. Simply put, neither the existence nor the nature of a voluntary sexual relationship, standing alone, is sufficient to warrant sealing a judicial proceeding in whole or in part. That some potential for embarrassment or criticism may result from plaintiff's choice to engage in a BDSM relationship does not justify removing litigation materials from public access. Rather, what justifies the use of pseudonyms here is plaintiff's

---

george-mason-university-violated-due-process-while-expelling-student-for-alleged-bdsm-related-sex-assault/.

status as an accused perpetrator of sexual misconduct—a rapist.[20] If plaintiff is ultimately found not responsible as to Roe's new accusations of sexual misconduct, if any, as he was by the first panel to hear his case with respect to the October 27 incident, then he should not have his name forever associated in the public mind with an accusation that carries a significant social stigma.

With respect to "the ages of the person whose privacy interests are sought to be protected," *id.*, plaintiff and Roe are legally adults, but the events in issue occurred when they were just barely so. In this respect, the ages of plaintiff and Roe do not point persuasively in favor of or against allowing a pseudonym. And as to the risk of unfairness to the opposing party, defendants fail to show convincingly any prejudice to their ability to defend themselves. Indeed, litigation has now concluded and there is no indication that defendants faced any hardship in mounting an effective defense as a result of the magistrate judge's order. Thus, the unfairness factor does not counsel against allowing plaintiff to proceed under a pseudonym.

And as a final point, it is pellucid that the public has an "especially compelling" interest in the underlying litigation here because the defendants are government officials sued in an official capacity. *See Public Citizen*, 749 F.3d at 274. Yet, this is a case in which the nature of the accusations against plaintiff are sufficiently severe that they rise to the level of an "extraordinary circumstance[]" in support of the use of a pseudonym. *Id.* Although there is a heightened public interest in this litigation as a result of the public nature of the defendants, the

---

[20] It is worth noting that it is not uncommon for courts to permit plaintiffs in actions challenging sexual misconduct adjudications to proceed under a pseudonym. *E.g., Doe v. Columbia Univ.*, 101 F. Supp. 3d 356 (S.D.N.Y. 2015); *Doe v. Washington & Lee Univ.*, No. 14-cv-52, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015). Moreover, it bears mentioning that given the long-term relationship between plaintiff and Roe, revealing plaintiff's identity will almost necessarily mean that Roe's identity is likewise revealed. Indeed, the record discloses that Roe proceeded against plaintiff in a state court action to obtain a protective order, such that a search of Virginia state court records for plaintiff's name would disclose Roe's identity.

use of a pseudonym is an appropriately tailored means of protecting plaintiff's and Roe's interests without unduly restricting public access to the litigation materials. Indeed, to the extent the public has a heightened interest in litigation against the government, "the public['s] strong interest in monitoring...the position that...government agencies take in litigation" is vindicated here because the public has full access to everything the government has filed with the exception of plaintiff's and Roe's identities. *Id.* at 271. Thus, the use of pseudonyms strikes an appropriate balance between ensuring that the public has access to the record in this case while also protecting plaintiff and Roe from any harm—including retaliatory physical harm—that might ensue from association with the accusations at issue here.

Accordingly, defendants' objection to the magistrate judge's order permitting plaintiff to proceed pseudonymously must be overruled.

**IV.**

For the reasons herein stated, an appropriate Order will issue entering an injunctive remedy and disposing of defendants' objection to the use of pseudonyms in this case.

Alexandria, Virginia
April 14, 2016

_____
/s/
T. S. Ellis, III
United States District Judge

18